**PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY, Washington, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent, City of Seattle, Intervenor.**

**No. 16653.**

United States Court of Appeals District of Columbia Circuit.

Argued May 7, 1962.

Decided Aug. 30, 1962.

Messrs. Clarence C. Dill, Spokane, Wash., and Joseph Volpe, Jr., Washington, D. C., with whom Mr. Bennett Boskey, Washington, D. C., was on the brief, for petitioner.

Miss Josephine H. Klein, Atty., F. P. C., with whom Messrs. Ralph S. Spritzer, Gen. Counsel, F. P. C., at the time the brief was filed, Howard E. Wahrenbrock, Sol., Leonard D. Eesley, Asst. Gen. Counsel, and Joseph B. Hobbs, Atty., were on the brief, for respondent. Mr. Arthur H. Fribburg, Atty., F. P. C., also entered an appearance for respondent.

Mr. Richard S. White, Seattle, Wash., of the bar of the Supreme Court of Washington, pro hac vice, by special leave of court, with whom Messrs. Robert L. McCarty and Charles F. Wheatley, Jr., Washington, D. C., were on the brief, for intervenor.

Before WILBUR K. MILLER, Chief Judge, and BAZELON and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

On July 29, 1957, the City of Seattle applied to the Federal Power Commission for a license[1] to construct and operate a hydroelectric project at what is called the "Boundary" site on the Pend Oreille River. Public Utility District No. 1 of Pend Oreille County, a municipal power corporation of the State of Washington, on August 27, 1957, petitioned to intervene, and later filed an application for a license for a similar project at its Z Canyon site, about one mile south of Seattle's "Boundary" location. At a hearing conducted by the Commission on these mutually exclusive applications, PUD argued that certain employees of the U. S. Bureau of Reclamation, who prepared the technical portions of Seattle's original application[2] and accepted compensation therefor, thereby violated 18 U.S.C. § 281,[3] often called a conflict

---

1. Under Section 4(e) of the Federal Power Act, 16 U.S.C.A. § 797(e), 49 Stat. 839.

2. One of them testified at the hearing before the examiner.

3. Section 281 is, in pertinent part, as follows:
"Whoever, being a Member of or Delegate to Congress, or a Resident Commissioner, either before or after he has qualified, or the head of a department, or other officer or employee of the United States or any department or agency thereof, directly or indirectly receives or agrees to receive, any compensation for any services rendered or to be rendered, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or

of interest statute, and that the City of Seattle was equally guilty under 18 U.S.C. § 2.[4] PUD insisted that, because of these alleged criminal acts, the material prepared by the government employees should be rejected, and Seattle should be disqualified as an applicant.

The examiner gave careful consideration to PUD's contention concerning § 281 and found the record presented "no conceivable conflict of interest," and on rehearing the Commission said on that subject:

"* * * On the record before us, we can find no conflict of interest which as a matter of policy would impel us to exclude the testimony and exhibits in question. And apart from such a conflict of interest as might require their exclusion as a matter of policy, we know of no basis in law or equity for excluding said testimony and exhibits. We cannot conclude, as PUD would have us do, that the appearance of Mr. Winter [the Board of Reclamation witness] and the admission into evidence of exhibits prepared by him and others constitute an assault upon the 'integrity of the administrative process' which requires dismissal of Seattle's application."

So, the Commission sustained the examiner's ruling on the conflict of interest question; and in accordance with his recommendation also rejected the other arguments of PUD and awarded a license to Seattle. PUD petitions for review.

Vigorously pressing upon us its contention that the Commission erred in not dismissing Seattle's application because of the alleged violations of § 281, PUD relies, *inter alia*, on the Dixon-Yates case [5] and May v. United States, 84 U.S. App.D.C. 233, 175 F.2d 994, cert. denied 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949).

The Supreme Court held in the Dixon-Yates case that the primary purpose of the statute there involved [6] "is to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the Government." The Court said a criminal prosecution is not the Government's sole remedy in a case such as Dixon-Yates, and that the public interest can be fully protected "only if contracts which are tainted by a conflict of interest on the part of a government agent *may* be disaffirmed by the Government." (Emphasis added.) 364 U.S. at 563, 81 S.Ct. at 316.

■ But the Dixon-Yates case does not hold, nor does any other authority to our knowledge, that a transaction is automatically void because there may have been involved in it a technical violation of the conflict of interest statutes. Neither the Government nor any of its agencies has attacked the grant of a license to Seattle as being contrary to the public interest because of the alleged violations of § 281, and no criminal action has been instituted against the parties accused by PUD.

The case of May v. United States, cited by the petitioner, holds, 84 U.S. App.D.C. at 245, 175 F.2d at 1006:

other matter in which the United States is a party or directly or indirectly interested, before any department, agency, court martial, officer, or any civil, military, or naval commission, shall be fined not more than $10,000 or imprisoned not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States."

4. Section 2 is as follows:
"(a) Whoever commits an offense against the United States, or aids, abets,

counsels, commands, induces, or procures its commission, is punishable as a principal.
"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

5. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

6. 18 U.S.C. § 434.

"* * * [I]f a Congressman receives compensation for services rendered by him to a person in relation to any matter in which the United States is interested, before any Government department, he is guilty of violating the statute [18 U.S.C. § 216], even though the service rendered was a proper act on his part. * * * "

But the Government department before which May appeared was not required to repudiate or disregard things properly said or done by him in his appearances merely because he may have violated the law by receiving compensation for appearing. For this reason we think the May case is not helpful to petitioner here.

■ We find nothing in the record to indicate that there was here the "influence peddling" at which § 281 was aimed. No corrupt or venal motive is shown on the part of Seattle or the Bureau of Reclamation engineers, and it does not appear that the Commission gave any more weight to the material furnished by the government employees than if it had been prepared by others. Moreover, § 281, a criminal statute, prescribes no civil or administrative sanctions. Even if it has been technically violated here, it does not follow that the grant of a license to Seattle should be set aside for that reason alone.

■ In another argument against the Commission's grant of a license to the City, PUD suggests that Seattle is not qualified to be a licensee, as it cannot acquire by purchase land indispensably necessary to its project because PUD owns the land and is unwilling to sell it.

It further suggests that Seattle is unable to acquire the land by condemnation because the Washington statute which confers the powers of eminent domain on a city which owns its own electric power and light plant forbids its exercise with respect to "the electric power and light plant or electric system, or any part thereof, belonging to or owned or operated * * * by a public utility district." [7] For these reasons, PUD contends that Seattle did not and cannot submit to the Commission

"[s]atisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks * * * "

as required by Section 9(b) of the Federal Power Act.[8] It is said that, therefore, Seattle's application should have been denied.

The Supreme Court has held that Section 9(b) does not in itself require compliance with state law; it only empowers the Commission to require such evidence of compliance with state law as, in the Commission's judgment, would be "appropriate to effect the purposes of a federal license on the navigable waters of the United States." First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n, 328 U.S. 152, 167, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). Strictly speaking, the question is not whether Seattle has complied or can comply with the state eminent domain statute, but rather whether the limiting provision of that statute prevents Seattle from exercising the right of condemnation conferred on it by Section 21 of the Federal Power Act.[9] That

7. Revised Code of Washington (1951), § 35.84.030:

"[§] 35.84.030. Limitation on right of eminent domain. Every city or town owning its own electric power and light plant may exercise the power of eminent domain as provided by law for the condemnation of private property for any of the corporate uses or purposes of the city or town: *Provided*, That ·no city or town shall * * * acquire by condemnation the electric power and light

plant or electric system, or any part thereof, belonging to or owned or operated * * * by a public utility district."

8. 16 U.S.C.A. § 802(b), 41 Stat. 1068.

9. 16 U.S.C.A. § 814, 41 Stat. 1074:

"Sec. 21. That when any licensee can not acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, main-

is to say, once Seattle has become a federal licensee, does the prohibitory provision of the state condemnation statute disable it from going forward with its federally-licensed project by preventing it from condemning under Section 21 of the Federal Power Act the land necessary for its purposes?

A similar problem was presented to the Ninth Circuit in State of Washington Dept. of Game v. Federal Power Comm'n.[10] There a license issued by the Power Commission to the City of Tacoma was attacked because the City had not obtained the approval of certain State officials as required by statutes of Washington and because the proposed dams would exceed the height limits the Washington legislature had put upon dams in the streams involved. The objectors contended that Tacoma, a creature of the State of Washington, could not act in opposition to the policy of the State or in derogation of its laws.

Relying on the First Iowa case, supra, the Court of Appeals for the Ninth Circuit held that "the state laws cannot prevent the Federal Power Commission from issuing a license or bar the licensee from acting under the license to build a dam on a navigable stream since the stream is under the dominion of the United States." 207 F.2d at 396. After this unequivocal holding, the Ninth Circuit went on to say:

"* * * However, we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted. There may be limitations in the City Charter, for instance, as to indebtedness limita-

tions. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but the Commission has no power to adjudicate them."

PUD relies on this language in arguing the court did not hold that Tacoma might act under the federal license in a manner prohibited by state law.

In City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958), the Supreme Court, in considering the same argument which PUD advances here, had occasion to construe the Ninth Circuit opinion. It said, at pages 339–40 of 357 U.S., at page 1220 of 78 S.Ct.:

"But the respondents say that the Court of Appeals did not decide the question of legal capacity of the City to act under the license and, therefore, its decision is not final on that question, but left it open to further litigation. They rely upon the following language of the opinion:

" '[* * *] However, we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted. There may be limitations in the City Charter, for instance, as to indebtedness limitations. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but the Commission has no power to adjudicate them.' [207 F.(2d) at 396.]

"We believe that respondents' construction of this language is in error. The questioned language expressly refers to possible 'indebted-

tenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in-conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by

the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. * * *"

10. 207 F.2d 391 (1953), cert. denied 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954).

ness limitations' in the City's Charter and 'questions of this nature,' *not to the right of the City to receive and perform, as licensee of the Federal Government under the Federal Power Act, the federal rights determined by the Commission and delegated to the City as specified in the license.* * * * " (Emphasis added.)

What precedes makes it clear that the State statute here involved, even if according to its own terms it is applicable, cannot make it impossible for Seattle as a federal licensee to condemn under the federal statute. Were it otherwise—i. e., if indeed the limitation of the state-granted right of eminent domain prevented the exercise of federally-granted power of condemnation in the area proscribed by it—PUD's argument that it disables Seattle in this situation could not be upheld. For, it does not appear that the land owned by PUD and needed by Seattle is a part of the former's electric plant or system which the Washington statute protects from condemnation by a city or town. The record does not show that the property here involved is used by PUD in its operations, or that in the future it will be useful to PUD in any way except in connection with its Z Canyon project which has been foreclosed by the grant of the license to Seattle. So, after the City's license is finally affirmed and it begins condemnation, the site now owned by PUD will not be in any sense a part of its electric plant or system and the State statute, even if in this situation it were effective according to its terms, would not prevent Seattle from condemning the needed land.

PUD attacks the Commission's action on several other grounds. Among them is the contention that the Commission deprived it of "a fair hearing on the economic and engineering feasibility of the conflicting projects by reserving for subsequent *ex parte* adjudication substantial issues relating to mine damage." The argument is based on the fact that Seattle did not propose, and the Commission did not require, elaborate and expensive precautions against damage to extensive lead and zinc mines in the area which PUD says may result from the construction of Seattle's dam.

■ Mining interests intervened before the Commission, contending that neither project should be licensed because either would threaten substantial permanent damage to their properties. Many expert witnesses testified on the mine damage issue, which was heard separately. The examiner concluded the possibility of damage was too slight and remote to require the refusal of a license. The Commission agreed. It said it did not anticipate serious damage to the mines from the Boundary reservoir but did require that certain steps be taken to guard against it. In addition, the Commission inserted the following in Seattle's license:

"Article 43. The licensee shall take appropriate measures to assure the watertightness of the reservoir, and the Commission reserves the right to require the licensee to take such measures both prior to and after the initial filling of the reservoir."

This is the so-called reservation of the mine damage issue "for subsequent *ex parte* adjudication" which PUD says deprived it of a fair hearing on the economic and engineering feasibility of the projects.

We consider Article 43 as no more than a requirement that, in addition to the specific precautionary measures prescribed elsewhere in the license, the licensee meet any unforeseen condition which may develop, and an assurance that the Commission will exercise continuous supervision over the project. The record justified the action of the Commission in this regard and did not demonstrate the necessity for making any further requirements of the licensee. We regard it as significant that the mining interests have not petitioned for review and have not sought to intervene in this proceeding.

**324**

The remaining points urged by PUD do not seem to us to require discussion. They relate to matters about which the Commission had discretion which it did not abuse.

Affirmed.