TEXAS EASTERN TRANSMISSION CORPORATION, ETC., PLAINTIFF-RESPONDENT, v. WILDLIFE PRESERVES, INC., ETC., DEFENDANT-APPELLANT.

TEXAS EASTERN TRANSMISSION CORPORATION, ETC., PLAINTIFF-RESPONDENT, v. TROY HILLS GAME AS-SOCIATION, INC., DEFENDANT, AND WILDLIFE PRE-SERVES, INC., ETC., DEFENDANT-APPELLANT.

TEXAS EASTERN TRANSMISSION CORPORATION, ETC., PLAINTIFF-RESPONDENT, v. FRANK SENA, JR., DE-FENDANT, AND WILDLIFE PRESERVES, INC., ETC., DEFENDANT-APPELLANT.

TEXAS EASTERN TRANSMISSION CORPORATION, ETC., PLAINTIFF-RESPONDENT, v. CLAUDE HABBERSTAD, DEFENDANT, AND WILDLIFE PRESERVES, INC., ETC., DEFENDANT-APPELLANT.

Argued October 10, 1966 — Decided December 5, 1966.

262

264

Mr. *Francis E. P. McCarter* argued the cause for appellant (*Messrs. Francis E. P. McCarter* and *Charles R. Merrill,* on the brief; *Mr. Stuart A. Young, Jr.,* attorney).

Mr. *Robert J. Del Tufo* argued the cause for respondent (*Messrs Jeffers and Mountain,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. The plaintiff Texas Eastern Transmission Corporation seeks to acquire by condemnation a right of way across four tracts of land in Morris County, New Jersey. These tracts are part of Troy Meadows Wildlife Preserve, an area of over 1400 acres maintained by defendant Wildlife Preserves. The proposed right of way is to be used for installation of an underground gas transmission pipeline. Answering the complaint, defendant alleged that the lands were devoted to a prior public use, *i. e.* conservation and the preservation of wildlife, and in the circumstances not subject to condemnation for plaintiff's purpose. The answer alleged also that the damage to the lands in their present public use would outweigh any loss plaintiff would suffer through denial of the right of way, and since an alternate route is "at plaintiff's disposal" no proper public purpose

would be served by authorizing the sought-for taking. The trial court on motion struck the answer as insufficient in law, and appointed commissioners to fix the value of the right of way to be taken. 89 *N. J. Super.* 1 (*Law Div.* 1965). The Appellate Division affirmed for the reasons expressed by the trial court, 90 *N. J. Super.* 385 (*App. Div.* 1966), and we granted defendant's petition for certification to review the matter. 47 *N. J.* 91 (1966).

Texas Eastern is a pipeline and natural gas company within the meaning of the Natural Gas Act, 15 *U. S. C.* § 717 *et seq.,* and is engaged in the interstate transmission of gas through pipelines. As such, it obtained a Certificate of Public Convenience & Necessity from the Federal Power Commission authorizing construction of a pipeline from its terminus near Hanover, New Jersey, to a point near Wanaque, New Jersey. *Texas Eastern Transmission Corporation, et al.,* 30 *F. P. C.* 1559 (1963). The certificate neither authorized nor prescribed a particular route for the pipeline between the two points; nor did it fix the width of the right of way to be acquired for the purpose. The course through defendant's lands and its 50-foot width were selected by plaintiff. (The record indicates that during these proceedings plaintiff agreed to reduce the width to 30 feet.) There is no doubt that, by virtue of the Federal Power Commission certificate, plaintiff may proceed to acquire land necessary for the pipeline by the exercise of eminent domain whenever it cannot be procured by contract or agreement as to purchase price. 15 *U. S. C.* § 717f(*h*).

Defendant Wildlife Preserves is a private, nonprofit, eleemosynary corporation organized under *R. S.* 15:1-1 *et seq.,* and is engaged in the acquisition of lands and their devotion to conservation and preservation of wildlife. It is undisputed that the lands involved here are devoted to such use. There is regrettable confusion in the record as to whether Wildlife Preserves is presently the owner of the premises in question or a lessee to which title will pass on termination of the lease. It is unclear also whether Wildlife

Preserves has leased the premises to the United States as a preserve. However, the United States, although aware of this proceeding, has not intervened, and we shall assume it has no active interest in the proceedings. Moreover, since Wildlife Preserves asserts ownership in its brief in this Court we shall assume for purposes of reaching the merits that ownership in fact exists.

■■ There is no doubt that the statute, 15 *U. S. C. §* 717f(*h*), under which plaintiff is empowered to condemn land and interests therein for pipeline installation purposes, represents a constitutional exercise of the Congressional power to regulate interstate commerce. *Thatcher v. Tennessee Gas Transmission Co.,* 180 *F. 2d* 644 (5 *Cir.* 1950), *certiorari* denied 340 *U. S.* 829, 71 *S. Ct.* 66, 95 *L. Ed.* 609 (1950). Nor can it be doubted that the authorization encompasses even the taking of lands devoted to another public use, if the taker's use is necessary to accomplish a public purpose, and that purpose is paramount, either by express language of the statute or by necessary implication therefrom. See, *Weehawken Tp. v. Erie Railroad Co.,* 20 *N. J.* 572, 578–581 (1956) ; *Public Utility Dist. No. 1 v. Federal Power Comm'n,* 113 *U. S. App D. C.* 363, 308 *F. 2d* 318 (*D. C. Cir.* 1962), *certiorari* denied 372 *U. S.* 908, 83 *S. Ct.* 719, 9 *L. Ed. 2d* 716 (1963), rehearing denied 372 *U. S.* 956, 83 *S. Ct.* 950, 9 *L. Ed. 2d* 980 (1963) ; *State of Washington, Department of Game v. Federal Power Comm'n,* 207 *F. 2d* 391 (9 *Cir.* 1953), *certiorari* denied 374 *U. S.* 936, 74 *S. Ct.* 626, 98 *L. Ed.* 1087 (1954) ; *State of Missouri ex rel. and to Use of Camden County v. Union Electric Light & Power Co.,* 42 *F. 2d* 692 (*D. C. Mo.* 1930) ; *Vermont Hydro-Electric Corporation v. Dunn,* 95 *Vt.* 144, 112 *A.* 223, 12 *A. L. R.* 1495 (1921) ; *Jahr, Eminent Domain* 37 (1953) ; 1 *Nichols, Eminent Domain* § 2.2 *p.* 205 (3*d* ed. 1964) ; 26 *Am. Jur. 2d, Eminent Domain* § 95 (1966).

■ Defendant is not a public agency or a public utility; it is a private enterprise carried on by a public-spirited nonprofit organization for the purpose of preserving our natural

wildlife resources. It has no federal or state power to acquire the lands it devotes to such object by condemnation; the acquisition must be by private means or methods. Under these circumstances, we are satisfied that Wildlife is not qualified under the prior public use doctrine to demand a determination whether such use may be subordinated to plaintiff's public use by means of condemnation. And even if it were, to deny plaintiff its statutorily granted right to condemn a necessary portion of defendant's property for a pipeline right of way would defeat the functions of the national government and run contrary to the intent of Congress as expressed in the Natural Gas Act. *Cf. Public Utility Dist. No. 1 v. Federal Power Comm'n, supra; State of Washington, Department of Game v. Federal Power Comm'n, supra; State of Missouri ex rel. and to Use of Camden County v. Union Electric Light & Power Co., supra,* 42 *F. 2d,* at *p.* 698.

But that view does not end the case. Defendant's voluntary consecration of its lands as a wildlife preserve, while not giving it the cloak of a public utility, does invest it with a special and unique status. Qualitatively, for purposes of the present type of proceeding, the status might be described as lower than that of a public utility but higher than that of an ordinary owner who puts his land to conventional use. Unquestionably, conservation of natural resources can and would become a legitimate public purpose if engaged in by the federal or state government or an authorized agency thereof. At both planes of government a sympathetic concern has been shown for such preserves, and acquisition of such resources with public money by eminent domain and otherwise has been authorized. See, statutes relating to "wildlife restoration" projects, 16 *U. S. C. A.* § 669 *et seq.; N. J. S. A.* 23 :12–1; 13 :14–1 *et seq.,* and protection of game and bird preserves, 16 *U. S. C. A.* §§ 671–697a; *Pearl River Valley Water Supply District v. Brown,* 248 *Miss.* 4, 156 *So. 2d* 572, 158 *So. 2d* 694 (*Sup. Ct.* 1963) ; *State ex rel. North Carolina Utilities Comm. v. Story,* 241 *N. C.* 103, 84 *S. E. 2d* 386 (*Sup. Ct.* 1954). Under the circumstances, and although plaintiff's

right to condemn land in this area for the pipeline is clear, we believe, for additional reasons to be stated, that Wildlife Preserves is entitled to have a plenary trial of its claim that a satisfactory alternate route is available to plaintiff which will not result in such irreparable damage to the preserve.

■■ Ordinarily where the power to condemn exists the quantity of land to be taken as well as the location is a matter within the discretion of the condemnor. The exercise of that discretion will not be interfered with by the courts in the absence of fraud, bad faith or circumstances revealing arbitrary or capricious action. *City of Trenton v. Lenzner,* 16 *N. J.* 465, 473 (1954); *City of Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, appeal dismissed 342 *U. S.* 874, 72 *S. Ct.* 168, 96 *L. Ed.* 657 (1951); *Tennessee Gas Transmission Co. v. Hirschfield,* 38 *N. J. Super.* 132, 138 (*App. Div.* 1955); *North Baptist Church v. City of Orange,* 54 *N. J. L.* 111 (*Sup. Ct.* 1891). In this connection we hold the view that when private property is condemned the taking must be limited to the reasonable necessities of the case, so far as the owners of the property taken are concerned.

Defendant claims that the proposed route of the right of way will have a devastating and irreparable effect upon its preserve; also, that plaintiff's refusal to consider or accept an adequate and serviceable alternate route on the preserve, which would "either greatly reduce or largely eliminate" the apprehended damage, is arbitrary and capricious. When the motion for judgment was argued originally in the trial court, defendant furnished no affidavits or other proof either to show the nature of the damage the preserve would suffer through the taking or the location of the suggested alternate route. In the Appellate Division and on the petition for certification to this Court from the adverse judgment defendant confined the argument in its brief largely to the contention that the taking is barred under the prior public use doctrine. But, as we have indicated above, that doctrine is neither applicable here in the sense in which it is usually applied, nor would it save defendant's land from condemnation in view of the

nature of plaintiff's statutory authorization. In the course of the argument, however, stress was laid upon the claim of plaintiff's arbitrariness in the selection of the location of the right of way. Being aware that the record was inadequate to present that question, we, in denying a motion for a stay, entered a special order giving the parties an opportunity, before the appeal was reached, to bring "for trial at once the question whether the route proposed is reasonable and whether there are alternate routes which will serve the purpose without interfering with Wildlife Preserves." No such action was taken in the trial court. Later on oral presentation in this Court defendant's position seemed to be that its pleadings and argument raised a factual issue on these matters, and that the supporting evidence would be offered at a plenary trial. But factual issues are created by proof in affidavit or testimonial form, and not by arguments. In any event, upon being advised as to the nature of the evidence defendant expected to introduce at a trial, we granted leave to file supporting affidavits. Thereafter such affidavits were filed.

Affidavits of two experts assert, among other things, that this preserve "is the finest inland, natural fresh water wetland in the entire Northeastern United States and its accessibility to the Metropolitan Area makes it even more valuable."

One expert says:

"The upland route would go through and eliminate part of the two best groves of trees in the whole preserve. These are small and are likely to be further reduced by being opened up to wind damage. These trees are important for the landscape in terms of esthetics and also in making up the diversity of habitats that in the opinion of ecologists is very important to the quality of Troy Meadows. They also affect very directly the nearby habitat in terms of shade, temperature, windbreaks, etc. This wooded habitat is not allowed to recover because of the necessity of keeping the right of way open through spraying of vegetation.

Relatively sterile subsoils can be expected to be left on the surface by the contractor. This requires many years to recover even a rough semblance of its former state and as a practical matter makes a permanent scar. This large stretch of disturbed ground is a source of silt pollution from clay particles washed into water courses by

rainfall which is very damaging over a wide area to an aquatic habitat such as Troy Meadows.

All the streams and waterways supplying clean and relatively clean water to Troy Meadows are crossed by the proposed pipe route. This includes one short stream entirely fed by springs which is very important as a control in scientific studies of the area since it is not polluted at all. In addition, the route crosses the small but vital area of springs in the meadows. Construction will disturb and substantially damage a number of these streams and springs."

A second expert asserts:

"10. If the pipeline is constructed near the Algonquin pipeline, it will require the cutting of a further or wider swath through some areas that are heavily populated by dense stands of hardwood trees. According to the plan of Texas Eastern, 30 feet of this swath will be kept permanently deforested to allow access to the pipeline. Any trees temporarily destroyed outside this 30-foot strip will not restore themselves for many years. The raising of sterile clay subsoil required by the trench excavation may, through mixture with topsoil in the immediate vicinity outside the 30-foot swath, so alter the physical environment of the immediate area that the trees cut down during construction may never be able to reestablish themselves. Even aside from the obvious esthetic considerations in cutting a swath through wooded areas, this removal of trees will have a profound effect upon animals and various forms of plant life, through resulting changes in the pattern of shade, temperature, humidity, and wind shielding. This detrimental effect will be only negligibly alleviated by attempts to preserve certain isolated trees.

\* \* \* \* \* \* \* \*

12. Thus far I have spoken only of the effects of the pipeline upon the immediate region of the excavation in the two alternate areas. Less apparent but fully as alarming is the possible deleterious effect of a further pipeline excavation near the Algonquin pipeline upon the entire marshy area of Troy Meadows which lies below it in elevation.

13. By their nature, fresh-water wetlands such as Troy Meadows are dependent upon a continuous supply of water flowing into and through the marshy basin. Installation of a pipeline along higher ground cannot help but affect materially the pattern of surface and artesian water drainage into the marsh. Any permanent shift in water level of different parts of the marsh can seriously alter the ecology of the area.

14. In addition to general surface water and artesian drainage, the marshes rely upon tributary streams, two of the largest of which will be crossed by Texas Eastern's pipeline on ground higher than the marsh, if the Algonquin route is used. Siltation of these streams is already a serious problem in Troy Meadows because of other con-

struction projects along their watershed. The excavation of a further trench in the clay subsoil above the marsh will greatly increase the silt content in these streams and hence in the marsh itself. Some of this silt settles in the streams and marsh and thereby physically interferes with the life cycle of tiny organisms upon which other animals of the marsh depend for their food supply. The finest particles of the clay subsoil do not settle, but remain in colloidal suspension in the marsh waters, and render the water perpetually cloudy. Cloudiness in the water disrupts the ecology of the entire marsh by blocking the light required by aquatic plant organisms, which in turn disrupts the food supply of animals that feed on these organisms, and the food supply of animals that feed on these animals, and so forth.

\* \* \* \* \* \* \* \*''

Both of these experts allege that there is a sound alternate route for the pipeline to the east of the plaintiff's proposed right of way. They describe it as generally following the existing Jersey Central Power & Light Company easement, but still running over a portion of defendant's preserve. It is said also that this alternate way will serve plaintiff's purpose, and will avoid the important wooded areas entirely and nearly all trees. If used "many water courses and the concentrated spring area will be avoided. Those crossed will be slow flowing and diffused and much less susceptible to damage." Additional advantages to the preserve, as well as some physical and maintenance benefits which will inure to plaintiff, are described.

In our judgment the statements in these affidavits raise a factual issue with respect to whether plaintiff's insistence upon the location of the right of way selected by it constitutes arbitrary action. It is to be regretted that procedural difficulties have delayed unduly the making of a record which presented the issue. But the unusual nature of the case and the obvious public interest in wildlife preserve conservation seemed to warrant the tolerance granted. *Cf. City of Pittsburgh v. Federal Power Comm'n*, 99 *U. S. App. D. C.* 113, 237 *F. 2d* 741 (*D. C. Cir.* 1956). The trial court was of the opinion that the availability of an alternate route was not a justiciable question since the doctrine of prior public use was not open to defendant, a private conservationist, and since

the doctrine had no pertinency, the location of the right of way rested in the discretion of the plaintiff. 89 *N. J. Super.*, at *pp.* 5–6.

 As has been set forth above we agree that the doctrine is not applicable and therefore no comparative evaluation of two public uses, one existing and one proposed, need be undertaken in order to determine which should prevail as the paramount use. See, *Namekagon Hydro Company v. Federal Power Comm'n,* 216 *F.* 2d 509 (7 *Cir.* 1954) ; *Public Utility Dist. No. 1 v. Federal Power Comm'n, supra.* But irrelevancy of the prior public use doctrine is not dispositive here ; the judicial vision is not limited to the horizon of that doctrine. Even a private property owner may present the issue of arbitrariness of a taking. *Tennessee Gas Transmission Co. v. Hirschfield, supra.* And, in the present case, as we have indicated, defendant's devotion of its land to a purpose which is encouraged and often engaged in by government itself gives it a somewhat more potent claim to judicial protection against taking of its preserve or a portion of it by arbitrary action of a condemnor. In such unique cases courts realize that more than a dollar valuation is involved. The public service being rendered must be considered and it cannot be evaluated adequately only in dollars and cents. *Cf. Namekagon Hydro Company v. Federal Power Comm'n, supra.* The difference is not in the principle but in its application ; that is, the *quantum* of proof required of this defendant to show arbitrariness against it should not be as substantial as that to be assumed by the ordinary property owner who devotes his land to conventional uses.

 Existence of an alternate route for a pipeline which will reasonably serve the utility's purpose, and which if utilized will avoid visiting on the condemnee's land the significantly disproportionate damage which the originally intended route would cause, is a matter which rationally relates to the issue of arbitrariness. Existence of a more desirable alternative is one of the factors which courts have recognized as entering into the determination of whether a particular

proposal would serve the public convenience and necessity. That a court has no authority to command the alternative does not mean that it cannot reject the original proposal. *Cf. City of Pittsburgh v. Federal Power Comm'n, supra,* 99 *U. S. App. D. C.* 113, 237 *F. 2d,* at *p.* 751; *Scenic Hudson Preservation Conf. v. Federal Power Comm'n,* 354 *F. 2d* 608 (2 *Cir.* 1965), *certiorari* denied *Consolidated Edison Co. v. Scenic Hudson Preservation Conf.,* 384 *U. S.* 941, 86 *S. Ct.* 1462, 16 *L. Ed. 2d* 540 (1966).

Scenic Hudson Preservation Conference, an unincorporated association consisting of a number of conservationist organizations, and certain neighboring municipalities sought an order setting aside a grant of permission by the Federal Power Commission to the Consolidated Edison Company of New York to construct a pumped storage hydroelectric project on the west side of the Hudson River at Storm King Mountain in Cornwall, New York. The project was a tremendous one, estimated to cost $162,000,000, and would consist of three major components: a storage reservoir, a powerhouse, and transmission lines. The storage reservoir, located over 1,000 feet above the powerhouse, was to be connected to the powerhouse, located on the river front, by a tunnel 40 feet in diameter. The powerhouse, which was to be both a pumping and generating station, would be 800 feet long and contain eight pump generators. The transmission lines were to run underground for some distance, then overhead, requiring a path up to 125 feet wide, for 25 miles until they reached Consolidated Edison's main connections with New York City.

Conservationist groups, which considered that the highlands and gorge of the Hudson River offer one of the finest pieces of river scenery in the world, became aroused. Evidence was offered as to certain alternatives to the proposed project. The Commission seemed to regard them as simply creating a conflict of opinion among the various experts, and therefore it neither made a comprehensive record with respect to them nor regarded them as matters which should influence

or control their decision on the utility's application to approve the contemplated project. The Court of Appeals reversed and remanded the application to the Commission for a full hearing and consideration of the suggested alternatives. In doing so, it said:

"The Commission should reexamine all questions on which we have found the record insufficient and all related matters. The Commission's renewed proceedings must include as a basic concern the preservation of natural beauty and of national historic shrines, keeping in mind that, in our affluent society, the cost of a project is only one of several factors to be considered. The record as it comes to us fails markedly to make out a case for the Storm King project on, among other matters, costs, public convenience and necessity, and absence of reasonable alternatives." 354 *F. 2d*, at *pp.* 624–625.

While the magnitude of the Storm King project dwarfs the undertaking in this case, nevertheless the principle espoused there, which calls for consideration of alternatives when a claim of arbitrary action is made, provides an important guideline here. Thus we conclude that defendant should have the opportunity to present its proof as to available alternate routes for plaintiff's pipeline, which defendant claims would better serve the over-all public interest and convenience. See, *City of Pittsburgh v. Federal Power Comm'n, supra*, 99 *U. S. App. D. C.* 113, 237 *F. 2d*, at *p.* 751, *fn.* 28.

On the remand hearing in the trial court the ultimate burden of proving arbitrariness in the choice of route will be on Wildlife Preserves. Procedurally, however, if it introduces reasonable proof of (1) the serious damage claimed to result from installation of the pipeline on the path chosen by plaintiff, and (2) an apparently reasonably available alternate route or routes, which will avoid the serious damage referred to, the burden of going forward with the evidence will shift to plaintiff. A *prima facie* case of arbitrariness having been made out, Texas Eastern may present its evidence to the contrary, which it claims indicates that the location of the right of way selected represented a reason-

able and not capricious choice, considering all the factors which may properly enter into the question of what course of action is reasonably required to serve the public convenience and necessity. In this connection plaintiff has suggested that the alternate route proposed by defendant will be much more costly than the one chosen. Of course, cost is a factor for consideration, but a relative one. Within reasonable limits the fact that an alternate route will be more expensive should not deter its selection by a utility, if the public convenience and necessity are better served thereby. See, *Scenic Hudson Preservation Conf. v. Federal Power Comm'n, supra; cf. In re Monmouth Consolidated Water Co.,* 47 *N. J.* 251, 261 (1966); *Washington Twp. v. Ridgewood Village,* 26 *N. J.* 578, 586 (1958). Information on the subject of such additional costs should be regarded by the trial court as within the knowledge and experience of the plaintiff. If opposition to a serviceable alternative route shown by defendant is to be predicated upon that ground, evidence of additional and disproportionate cost should be treated as part of plaintiff's burden of meeting defendant's *prima facie* case.

In remanding the case to the trial court, we express no opinion on the merits of the controversy. That determination can be made only after full development of the facts. In view of the unusual nature of the case, and the fact that the procedural difficulties already mentioned have occasioned considerable delay, we direct that the matter be set down for immediate trial.

Reversed.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.