**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0355-23
              A-0357-23

BOROUGH OF CARTERET,

     Plaintiff-Respondent,

v.

CARTERET TERRACE, LLC, and
THE BANK OF NEW YORK
MELLON, PAR U HARTFORD LIFE
INSURANCE COMFORT TRUST,

     Defendants-Appellants,

and

LASALLE BANK NATIONAL
ASSOCIATION, COUNTY OF
MIDDLESEX, MIDDLESEX WATER
COMPANY, NUI CORPORATION,
d/b/a ELIZABETHTOWN GAS
COMPANY, BELL ATLANTIC-NEW
JERSEY, INC., PUBLIC SERVICE
AND GAS COMPANY, PIVOTAL
UTILITY HOLDING, INC., and ETG
ACQUISITION CORPORATION,

     Defendants.

_____

BOROUGH OF CARTERET,

     Plaintiff-Respondent,

v.

MERIDIAN II, LLC,

     Defendant-Appellant,

and

PRINCIPAL LIFE INSURANCE
COMPANY AND PIVOTAL
UTILITY HOLDINGS, INC., d/b/a
ELIZABTHTOWN GAS COMPANY,

     Defendant.
_____

Argued September 26, 2024 – Decided October 17, 2024

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket Nos. L-1308-23 and L-1313-23.

Anthony F. DellaPelle argued the cause for appellants (McKirdy, Riskin, Olson & DellaPelle, PC, attorneys; Anthony F. DellaPelle, of counsel and on the briefs; Michael Realbuto, on the briefs).

Kevin P. McManimon argued the cause for respondent (McManimon, Scotland & Baumann, LLC, attorneys; Kevin P. McManimon and Malcolm X. Thorpe, on the briefs).

2

PER CURIAM

In these related appeals, which we consolidate for the purpose of issuing a single opinion, defendants Carteret Terrace, LLC (Carteret Terrace)[1] and Meridian II, LLC (Meridian) appeal from the Law Division's September 15, 2023 order for judgment and appointing commissioners permitting plaintiff Borough of Carteret (Borough) to take portions of defendants' properties pursuant to its power of eminent domain for use as a public road. We affirm.

On April 8, 2021, plaintiff adopted an ordinance authorizing the acquisition of certain real property, including portions of adjacent properties owned by defendants, for the purpose of building a roadway extension to directly connect plaintiff's downtown and waterfront areas (the Extension), as well as to make related sidewalk and traffic signal improvements. The Extension will link Carteret Avenue, which currently terminates at Roosevelt Avenue, with Peter J. Sica Industrial Highway (Industrial Highway) by extending Carteret Avenue through a portion of the Carteret Terrace property now used as an internal access

<hr>

[1] Lienholder The Bank of New York Mellon, as trustee for Par U Hartford Life Insurance Comfort Trust, filed a contesting answer and is a party to this appeal, but does not assert any independent arguments.

A-0355-23

roadway and parking lot, and a portion of the Meridian property now used as a detention basin.

The Carteret Terrace property is developed with an existing, multifamily apartment complex located at the intersection of Roosevelt Avenue, Carteret Avenue, and the internal access roadway known as Abbi Road. The Carteret Terrace complex, constructed in 2001, consists of 160 residential units and 311 parking spaces. The Meridian property is developed with an existing, 190-unit multifamily apartment complex located along Industrial Highway, adjacent to where Industrial Highway will intersect with the Extension. The Meridian complex was constructed in 2009.

To facilitate the Extension through the Carteret Terrace property, plaintiff seeks an easement along the north end of the property where the Extension will be constructed. The Extension will create seventeen new angled parking spaces and two access driveways from the Extension into the Carteret Terrace and Meridian complexes. Plaintiff also seeks a sidewalk easement along the west end of the property, a traffic signal easement at the northwest corner of the property, and two temporary construction easements. To facilitate the Extension through the Meridian property, plaintiff seeks an easement through a portion of

4

an existing detention basin that will be redesigned by plaintiff, as well as two temporary construction easements.

Plaintiff contends its plans for a roadway similar to the Extension can be traced to the 1970s. In May 1973, plaintiff's Master Plan and Master Plan Reexamination Report, which included a circulation plan and plan for proposed street improvements, contemplated an extension of Carteret Avenue like the Extension at issue. Specifically, the plans depict a road connecting Roosevelt Avenue to the area that is now Industrial Highway. More than two decades later, plaintiff's June 1998 Master Plan Reexamination Report included two maps depicting a road connecting Roosevelt Avenue to Industrial Highway.

On May 12, 2004, plaintiff entered into a redevelopment agreement with Carteret Landing, L.L.C., that contemplated extending Carteret Avenue to the waterfront area.[2] The redevelopment agreement provided:

> The project also will include the extension of Carteret Avenue, from Roosevelt Avenue extending eastward to the ferry landing, the construction of Landings Boulevard, a major cross street running parallel with the waterfront and the extension of Middlesex Avenue from Industrial Road extending eastward to the marina.

---

[2] Carteret Landing, L.L.C., was a joint venture consisting of Roseland Property Company, BNE Real Estate Group, and Atlantic Realty Development Corporation. Atlantic Realty Development Corporation is the parent company of Carteret Terrace and Meridian.

The extension of Carteret Avenue will occur as a component of Phase I.

The redevelopment agreement was ultimately terminated by agreement of the parties on August 11, 2010.

In 2018, in anticipation of the construction of a ferry terminal on plaintiff's waterfront with ferry service to and from New York City, plaintiff commissioned a study of potential ferry ridership demand by the Rutgers University Bloustein School of Planning and Public Policy (Rutgers Study). The Rutgers Study predicted anticipated ferry ridership ranging from 739 to 2,199 weekday boardings. According to the study, as much as fifteen percent of the anticipated vehicular traffic to or from the ferry terminal, or up to 330 vehicles per day, would likely use the Extension. Plaintiff initiated its efforts to create the Extension in anticipation of traffic associated with the ferry terminal and other waterfront attractions.

In 2021, a ferry terminal traffic impact study was prepared by McCormick Taylor (McCormick Study) for the New Jersey Department of Transportation (NJDOT). The purpose of the study was to "identify the traffic impacts of the proposed [ferry] terminal on the adjacent roadway network and to provide recommendations . . . for roadway improvements to accommodate the future traffic demands." The McCormick Study assumed the Extension would be

completed by 2022 and, for its analysis of expected traffic conditions in 2022, considered the "traffic redistributions caused by the proposed" Extension.

McCormick Taylor conducted "manual turning movement traffic counts" at each intersection in the area. The study assumed seventy-three percent of ferry riders would drive to the terminal alone and eleven percent would carpool. The McCormick Study predicted forty-five percent of the vehicular traffic, again hundreds of vehicles per day, would likely use the Extension traveling to or from the ferry terminal.

Consulting and Municipal Engineering Associates (CME) conducted a review of the proposed improvements, including the installation by the County of Middlesex (County) of traffic signals at the proposed intersections. CME determined that, with the construction of the ferry terminal and the Extension, installation of the new traffic signals and replacement of existing traffic signals in the area is warranted. CME also conducted traffic counts "to evaluate the existing and proposed operations for [the proposed] traffic signals . . . ." CME's traffic counts also predicted hundreds of trips per day along the Extension to and from the ferry terminal and waterfront area.

On July 18, 2019, CME, on behalf of plaintiff, applied to NJDOT for funding in connection with the Extension from NJDOT's municipal aid program.

7

The application contained a description of the Extension, photographs, and an aerial map. In its application, plaintiff stated:

> [It i]s proposing the extension of Carteret Avenue from its existing "T" intersection with Roosevelt Avenue . . . through to [Industrial Highway] (approximately 650 feet) partially along the alignment of an existing parking lot. At its future intersection with Industrial Highway, Carteret Avenue will connect to Waterfront Access Road, which leads to the Waterfront Park, boat ramp, fishing pier, municipal marina, [New Jersey] State Police Marina Barracks, and future ferry terminal with service to New York City. The road and sidewalk extensions will provide a critical connection to the Borough's two . . . mile long Arthur Kill Riverwalk, including walking paths and observation piers stretching the length of the Borough's waterfront along the Arthur Kill.
>
> . . . .
>
> The extension of Carteret Avenue will also serve[] [as] an entrance feature connecting the Borough's Waterfront and the developing Downtown Arts District, which stretches from Washington Avenue to Carteret Avenue . . . .

On February 6, 2020, NJDOT awarded plaintiff $700,000 in funding for the Extension. On May 2, 2022, CME submitted plans for the Extension, which included specifications, a design certification, and a cost estimate, to NJDOT for approval. Included within the plans were detailed construction drawings, which showed the location of the Extension, where and how it will intersect Roosevelt Avenue and Industrial Highway, the location of the proposed

driveways to the Carteret Terrace and Meridian complexes, and the proposed angled parking along the Extension.

NJDOT provided detailed comments suggesting revisions. In response, CME submitted revised construction drawings to NJDOT. On May 12, 2022, NJDOT approved the resubmitted design for the Extension and authorized bidding for the project.

Plaintiff and the County entered into an agreement that apportioned responsibility for work and funding in connection with the installation of traffic signals on both ends of the Extension. The County agreed, among other things, to perform all necessary engineering and design work related to the traffic signals and pay a portion of the construction costs.

On March 7, 2023, after its attempts to negotiate the purchase of the properties from defendants failed, plaintiff filed its verified condemnation complaints and orders to show cause. The court consolidated the matters and entered an order to show cause. On May 5, 2023, the court conducted a hearing on the order to show cause at which defendants contended the taking was unnecessary, and therefore arbitrary and capricious. On May 10, 2023, the court entered an order, supported by a written opinion, finding a plenary hearing was

required and permitting the parties to engage in limited discovery "to ascertain the necessity of the present taking."

On August 15, 2023, the court conducted a plenary hearing on plaintiff's application. Defendants' expert traffic engineer, Daniel Disario, testified the Extension is not designed in accordance with applicable American Association of State Highway and Transportation Officials (ASHTO) guidelines, New Jersey Residential Site Improvement Standards (RSIS), and plaintiff's own ordinances regarding intersection geometry. According to Disario, all those standards provide intersections should meet at approximately a ninety-degree angle and "angles less than [sixty] degrees normally warrant realignment closer to [ninety] degrees."

In this case, the intersection with Roosevelt Avenue is fifty-eight degrees and the intersection with Industrial Highway is sixty-two degrees, which, according to Disario, violate all applicable standards for intersection geometry. Disario, however, agreed that "there are intersections in . . . [New Jersey], maybe even in the Borough, that have those kinds of skewed intersections, but in [his] opinion, when you[ are] designing something new[,] you should strive for better design rather than lesser design."

Disario testified that when plaintiff submitted its initial 2019 application for NJDOT funding, it misrepresented to NJDOT that the Extension would be built in compliance with ASHTO standards. Plaintiff also misrepresented to NJDOT that the angled parking spaces on the Extension would be unrestricted, even though plaintiff advised defendants the spaces would be reserved for their use.

Disario testified that according to the Rutgers Study, fifteen percent of the anticipated ferry traffic, or as many as 330 vehicles per day, would use the Extension to access the ferry terminal, and the McCormick Study concluded forty-five percent of the ferry traffic would likely use the Extension. According to Disario, assuming the forty-five percent prediction in the McCormick Study is correct, the Extension is unnecessary because the existing roadways and intersections are sufficient to handle the predicted increased ferry traffic without "any change to the level of service that exists today." Disario opined the Extension "itself does not improve traffic flow in this area."

Disario testified that, in "[his] opinion[,] . . . angled parking should[ not] be provided along local roadways" because it "inherently is not good design and inherently it[ is] less safe." Disario conceded angled parking is not prohibited and is provided on other streets within the Borough.

11

Disario also testified that defendants would be left with approximately 260 parking spaces after the Extension is built even though over 300 are required by the RSIS. He conceded CME conducted a parking study and determined defendants used a maximum of 247 spots during the period of the study. Disario did not conduct any similar study.

Disario also testified the Extension could result in garbage trucks needing to temporarily block the road when collecting trash. However, he conceded the Extension has the "potential to provide improved pedestrian access to the marina or ferry" and "any time you can enhance pedestrian connections, that[ is] a good thing."

Defendants also called James C. Watson, a licensed professional engineer employed by CME and a consultant for the County, who testified the proposed intersections comply with County design standards. According to Watson, in accordance with NJDOT standards, "[sixty] degrees is a standard [CME] tr[ies] to hit" when designing roads for the County. "However, it is a . . . should condition. It[ is] not a hard standard that it has to be [sixty] degrees." Here, the proposed intersections "were right at that [sixty]-degree mark, somewhere between [fifty-eight], [sixty-two] degrees . . . ." Watson also testified the intersections comply with applicable sight distance guidelines because they are

12

controlled by traffic signals and "there[ is] less concern with the . . . [sight] distances because as per ASHTO, we really only need the approaching vehicles to be able to see the stopped vehicles on the adjacent roadway . . . ."

Watson testified that full-size WB-67 (sixty-seven foot) tractor-trailer vehicles would not be able to turn onto the Extension. However, the weight limit on the Extension would be four tons and a "WB-67 . . . does[ not] even come close to that weight limit."

Defendant called John Paul Dupont, director of municipal engineering for the Borough, who testified the "Borough's consultant reviewed [the intersection angles] with the Borough. [They] did look at th[e] intersections and they were signalized and [they] were comfortable with that." Dupont also testified that if the Extension created any issues with trash collection, the Borough would assist with trash collection.

Trevor Taylor, a civil engineer employed by CME who participated in the design of the Extension, testified for plaintiff as an expert in civil engineering. Taylor testified the 2019 application for DOT funding did not include detailed specifications for the Extension project because those details did not yet exist, and CME did not at that point know the dimensions and angles of the intersections. However, the subsequent NJDOT submission in 2022 did include

detailed design specifications that showed the proposed intersection geometry. The plans submitted in 2022 were the plans NJDOT approved. Subsequent to NJDOT approval, the specifications were changed to bring the internal driveways from the Extension into defendants' complexes closer to ninety degrees, but the intersections with Roosevelt Avenue and Industrial Highway were not modified from what NJDOT approved.

With respect to the intersection angles, Taylor testified the proposed intersection with Roosevelt Avenue is fifty-eight degrees but "[w]hen you look at ASHTO, it says . . . 'should' . . . get as close to [sixty] as possible, so we use [sixty] as a benchmark . . . ." According to Taylor, "two degrees off from [sixty] degrees . . . [ is] close enough to [sixty] . . . ." Sight triangles are not required because the intersections are controlled by traffic lights. Taylor testified that power outages are not a significant concern because CME designs traffic signals with "a [twenty-four]-hour battery backup within the controller box and . . . a hookup for a generator . . . if . . . the power[ is] out for more than [twenty-four] hours . . . ."

On September 15, 2023, the court entered an order for judgment and appointing commissioners, supported by a written opinion. It rejected defendant's necessity claim because plaintiff is not required to prove the

proposed Extension is necessary and "the mere existence of alternative routes does not prove that [p]laintiff's desire for a new route is arbitrary." The court also found defendants' "safety concerns are not enough to deem the taking arbitrary." It noted NJDOT approved plaintiff's plans and design specifications and Taylor refuted defendants' claims regarding intersection angles and sight triangles.

On September 25, 2023, the court entered an order appointing commissioners. Defendants subsequently moved for a stay pending appeal, which the court denied. On March 14, 2024, we granted defendants' motion for a stay.

On appeal, defendants argue the trial court erred when it found plaintiff's proposed taking was not arbitrary and capricious. Specifically, they argue the court erred in finding the taking is necessary and justified and that the safety and design issues with the taking were justified under the law.

We review de novo "[the] trial court's interpretation of the law and the legal consequences that flow from established facts . . . ." Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). However, we defer to the court's factual findings when they are "'supported by adequate,

substantial and credible evidence.'" Zaman v. Felton, 219 N.J. 199, 215 (2014) (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).

"'Eminent domain is the power of the State to take private property for public use . . . . It is a right founded on the law of necessity which is inherent in sovereignty and essential to the existence of government[.]'" Twp. of W. Orange v. 769 Assocs., L.L.C., 172 N.J. 564, 571 (2002) (alteration and omission in original) (quoting State v. Lanza, 27 N.J. 516, 529 (1958)).[3]

Courts use a limited and deferential standard when reviewing a municipality's decision to use its eminent domain power. 769 Assocs., 172 N.J. at 571-72. "Ordinarily, when a municipality adopts an ordinance in the exercise of its power of eminent domain, that determination is presumed valid and entitled to great deference." Borough of Essex Fells v. The Kessler Inst. for Rehab., Inc., 289 N.J. Super. 329, 337 (Law Div. 1995) (citing Taxpayers Ass'n of Weymouth Twp. v. Twp. of Weymouth, 71 N.J. 249, 264 (1976)). "Courts

---

[3] The Constitution gives the State the right to take private property for public use, but the State must pay "just compensation." N.J. Const. art. I, ¶ 20. The Constitution allows the Legislature to delegate the power of eminent domain to State agencies or political subdivisions. N.J. Const. art. IV, § 6, ¶ 3. The

Legislature authorized municipalities to acquire through condemnation, N.J.S.A. 40A:12-2(a), "[a]ny real property[,]" N.J.S.A. 40A:12-4(a).

will generally not inquire into a public body's motive concerning the necessity of the taking or the amount of property to be appropriated for public use." Ibid. (citing Riggs v. Twp. of Long Beach, 109 N.J. 601, 613 (1988)). "[A] reviewing court will not upset a municipality's decision to use its eminent domain power 'in the absence of an affirmative showing of fraud, bad faith, or manifest abuse.'" 769 Assocs., 172 N.J. at 571 (quoting City of Trenton v. Lenzner, 16 N.J. 465, 473 (1954)). Our Supreme Court has "never held that the standard is other than the manifest abuse of discretion test." Id. at 578.

The power of eminent domain is, however, subject to several constitutional limitations. "[T]he property acquired must be taken for a 'public use,' the State must pay 'just compensation' in exchange for the property, and no person shall be deprived of [their] property without due process of law." Id. at 572. In addition, "when private property is condemned[,] the taking must be limited to the reasonable necessities of the case . . . ." Tex. E. Transmission Corp. v. Wildlife Pres., Inc., 48 N.J. 261, 269 (1966).

"New Jersey courts traditionally have granted wide latitude to condemning authorities in determining what property may be condemned for 'public use,' reasoning that it is the province of the Legislature to shape the contours of the 'public use' requirement." 769 Assocs., 172 N.J. at 572 (first

citing Burnett v. Abbott, 14 N.J. 291, 294 (1954); then citing Lenzner, 16 N.J. at 473). Public use is "anything that 'tends to enlarge resources, increase the industrial energies, and . . . manifestly contributes to the general welfare and the prosperity of the whole community.'" Id. at 573 (quoting Julius L. Sackman, 2A Nichols' The Law of Eminent Domain, § 7.02[2] (3d ed. rev. 1990)). "Given the broad definition of 'public use,' it is not essential that the entire community or even any considerable portion of the community directly enjoy or participate in the condemned property for the taking to constitute a 'public use.'" Ibid. (citing State Highway Comm'r v. Totowa Lumber & Supply Co., 96 N.J. Super. 115, 121 (App. Div. 1967)).

Pursuant to these principles, we affirm substantially for the reasons set forth in the court's September 15, 2023 written opinion. We add the following comments.

We are not persuaded by defendant's contention that plaintiff's use of the power of eminent domain in this case is arbitrary and capricious because the road extension is "unnecessary." Essentially, defendants contend sufficient routes to the waterfront area already exist and are adequate to handle the anticipated ferry terminal and waterfront area traffic without the Extension. As

a result, plaintiff should not be permitted to build the Extension because it is not necessary to do so.

"Existence of a more desirable alternative [route] is one of the factors which courts have recognized as entering into the determination of whether a particular proposal would serve the public convenience and necessity." Tex. E., 48 N.J. at 273-74. Plaintiff's choice of the route, however, "is entitled to deference" and it "is under no affirmative obligation to show that the proposed road is superior to [another] right-of-way." 769 Assocs., 172 N.J. at 579. The "burden of proving arbitrariness in the choice of route will be on" the party challenging the condemnation. Tex. E., 48 N.J. at 275. Consistent with the applicable manifest abuse of discretion test, plaintiff need only establish "that the location of the right of way selected represented a reasonable and not capricious choice . . . ." Id. at 275-76.

We are satisfied plaintiff amply demonstrated its plan to construct the Extension over the chosen route is reasonable and not capricious. By all accounts, hundreds of cars are expected to use the Extension every day to access the ferry terminal alone. The Extension will connect the heart of the Borough with the ferry terminal and waterfront area. It will also provide signal-controlled intersections for pedestrians to use when accessing the area. The choice of the

location for the Extension was anything but capricious. In fact, the concept of creating a thoroughfare like the Extension existed since at least 2004 and possibly decades before that. The route represents the most direct way to connect Carteret Avenue to the ferry terminal and waterfront area.

Defendants' reliance on Borough of Glassboro v. Grossman, 457 N.J. Super. 416 (App. Div. 2019), in support of their claim that plaintiff must establish necessity is misplaced. In Grossman, the proposed condemnation was based on the Local Redevelopment and Housing Law (LRHL), N.J.S.A. 40A:12A-1 to -49, which authorizes a municipality to acquire land by condemnation for a redevelopment project only if the condemnation is "necessary for the redevelopment project." Id. at 422.

Based on that statutory limitation, we held a condemnation pursuant to the LRHL must be "reasonably necessary" for an identified redevelopment project, not to stockpile land for potential future projects. Grossman is not applicable here because the proposed condemnation is not based on the LRHL and plaintiff is taking the property for an identified and approved plan, not to stockpile property. Defendants' reliance on Casino Reinvestment Auth. v. Birnbaum, 458 N.J. Super. 173 (App. Div. 2019), misses the mark for the same reasons.

Contrary to defendants' contention, plaintiff "is under no affirmative obligation to show that the proposed road is superior to [another] right-of-way." 769 Assocs., 172 N.J. at 579. Nor is plaintiff under any obligation to prove the Extension is necessary. Plaintiff need only demonstrate the route selected is reasonable and not capricious. Tex. E., 48 N.J. at 275-76. We conclude plaintiff has more than satisfied that standard.

We also conclude the court correctly rejected defendants' claims regarding the design of the intersections and angled parking spaces. These claims are based on various design standards and guidelines that are not absolute or intended for rigid application. They are, by their very terms, guidelines that "should" be applied as the case warrants when designing roadways.

Of equal importance, the project plans, which included detailed drawings depicting the Extension and its intersections with Roosevelt Avenue and Industrial Highway, were reviewed and approved by NJDOT and the County's representatives and were reviewed by the Borough's employees.[4] Defendants'

---

[4] Defendants' contention that plaintiff made misrepresentations to NJDOT regarding the design of the Extension in its 2019 funding application lacks merit. As Taylor explained, the 2019 funding application was submitted before detailed design drawings were created and NJDOT approved the detailed drawings showing the intersection angles in 2022.

A-0355-23

design claims are not sufficient to substantiate a finding of arbitrary or capricious conduct.

We discern no basis to find plaintiff abused its considerable discretion in exercising its power of eminent domain in this case.

To the extent we have not addressed any of defendants' remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.  The stay we entered on March 14, 2024, is continued for twenty days to permit defendants time to file a petition for certification and to seek a further stay from our Supreme Court.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22