AXELRAD, J.T.C.
In this local property tax matter, the taxpayer, Casino Reinvestment Development Authority (“CRDA”), contests the assessments of two single family homes located at 217 Grammercy Place and 219 Grammercy Place, in the City of Atlantic City. The properties are more particularly identified on the Tax Map of the City of Atlantic City as Block 94, Lots 102.10 and 102.11, and are part of a thirty-nine unit residential subdivision known as “Madison Landing.” CRDA submits that the properties are exempt from taxation as “property of the Casino Reinvestment Development Authority” under N.J.S.A. 5:12-167.
The land had been previously acquired by CRDA and the subject lots were listed on the municipality’s tax assessment lists as exempt for the 1997 and 1998 tax years. In December, 1997, construction was completed and certificates of occupancy were issued for each lot. The subject properties were thereafter assessed by Atlantic City as omitted added (N.J.S.A. 54:4-63.26) for the 1998 tax year, which assessments were affirmed by the Atlantic County Board of Taxation as follows:
Lot 102.10 Lot 102.11
Land $ 25,200 $ 25,200
Improvements $ 75,800 $ 75,800
Total $101,000 $101,000
Counsel filed cross motions for summary judgment in which CRDA sought a determination that the properties are exempt from local property taxation while the city sought a determination that they are subject to local property taxation. In support of these motions both counsel submitted statements of material facts; R. 4:46-2(a). CRDA submitted an affidavit of its staff counsel with the Developer’s Agreements, addenda, resolutions, and deeds. The city submitted the certification of its assessor with various municipal approvals and permits. The city thereafter withdrew its cross motion on the basis that CRDA raised new allegations in its reply papers and requested that the court deny *468 CRDA’s motion as premature to allow the city time to engage in discovery regarding the expectations of CRDA and the developer regarding ownership and transfer of title to the units in order to support the city’s theory of “equitable conversion.”
In 1984, in an attempt to accelerate redevelopment in Atlantic City, the Legislature adopted amendments to the Casino Control Act, N.J.S.A. 5:12-1 to 210 (“the Act”) and revised the prospective investment obligation of casinos. L. 1984, c. 218. Pursuant thereto, the CRDA was established as a public body, funded by casinos through a series of investment alternatives. N.J.S.A. 5:12-144.1. CRDA’s purposes, as set forth in N.J.S.A. 5:12-160, include:
a. ... to directly facilitate the redevelopment of existing blighted areas ...
d. to provide loans and other financial assistance for the planning, acquisition, construction, reconstruction, demolition, rehabilitation, conversion, repair or alteration of buildings or facilities to provide decent, safe and sanitary dwelling units for persons of low, moderate, median range, and middle income in need of housing, ...
i. to cooperate with and assist local government units in financing any eligible project; ... and
m. any combination of the foregoing.
CRDA’s enabling legislation expressly confers upon CRDA broad powers to effectuate its goals. As set forth in N.J.S.A. 5:12-161, the powers include:
c. To acquire, hold, use and dispose of any eligible project in which it is making an investment; ...
g. To enter into any agreements or contracts, execute any instruments, and do and perform any acts or things necessary, convenient, or desirable for the purposes of the Casino Reinvestment Development Authority, ...
o. To enter into all agreements or contracts with any governmental unit or person, execute any instruments, and do and perform any acts or things necessary, convenient or desirable for the purposes of the Casino Reinvestment Development Authority to carry out any power expressly given in this act; and
p. To exercise the right of eminent domain in the city of Atlantic City.
On October 9, 1987, the City Council adopted an ordinance which approved a Redevelopment Plan for the Northeast Inlet section of the city. Over the course of several years thereafter, CRDA, pursuant to its enabling legislation, determined that various housing projects within the Redevelopment Plan area were “eligible projects” pursuant to N.J.S.A. 5:12-173. CRDA granted *469 project approval and reserved funds to be utilized in furtherance of the development of these projects. On November 8, 1991, CRDA adopted a resolution which preliminarily determined the eligibility of the “Phase III Acquisition Project” involving the acquisition of privately owned parcels in Tax Blocks 93, 94 and G-16, the relocation of the residents from these houses, the demolition of existing structures, and the construction of new housing. Through a series of several other resolutions, CRDA granted project approval for the acquisition of approximately 164 privately owned parcels in these tax blocks, the demolition of the structures thereon, and the funding for the project.
CRDA acquired the subject site in furtherance of the Northeast Inlet Redevelopment Plan. Pursuant to resolution adopted on April 9, 1996, CRDA determined that the Madison Landing Project
is in furtherance of the public purposes of the Authority as set forth in N.J.S.A. 5:12-160 and promotes the most pressing social, health, and economic well being of the people of the State of New Jersey and the residents of the City of Atlantic City and is therefore, an ‘eligible project’ as set forth in N.J.S.A. 5:12-173.
CRDA reserved funds and authorized the retention of Procida Realty & Construction (“PRC”) to develop and complete construction of the project. Thereafter, CRDA and PRC entered into a Stage I of Developer’s Agreement dated September 6, 1996 for preparation of the site, and a Stage II of Developer’s Agreement dated July 21, 1997 for construction of the units and development of the project.
In accordance with its broad statutory powers, CRDA contracted with PRC to develop the project and entered into an arrangement whereby CRDA subsidized the costs of the approval process and construction of housing units to cover the projected gap between the costs and sales proceeds. Under the terms of the Developer’s Agreements, CRDA and the lender were to fund all costs and expenses, CRDA had the authority to terminate PRC’s contract with or without cause, and all engineering reports and drawings would remain the property of CRDA. Pursuant to the agreements, PRC was hired essentially as a general contractor, with additional responsibilities to obtain site plan approval prior to *470 construction and to market the units after construction. PRC was to be paid a fee for its services pursuant to requisitions made to CRDA similar to any general contractor. The payment of the fee was not contingent upon or related to the sale of the units (other than a potential developer’s bonus in CRDA’s sole discretion of up to $2000 per unit paid at the close-out of the project to the extent that savings were realized on the cost to develop the project). There would be a simultaneous transfer of each of the improved lots from CRDA to PRC for nominal consideration and from'PRC to the purchaser, with homeowner warranties, for a sales price established by CRDA. In addition, CRDA would retain all rights to the sales proceeds, to disburse at its discretion in accordance with the Developer’s Agreement!
In May 1997 PRC began marketing the properties in Madison Landing for sale, construction was completed in accordance with the; Agreements, and certificates of occupancy were issued in December,, 1997. On September 9, 1998, Lot 102.10 was sold to Adele Kwaw by way of simultaneous transfer from CRDA to PÉC for $1.00 and from PRC to the homeowner for $106,000 in accordance with the Stage II of Developer’s Agreement. CRDA retained ownership of Lot 102.11 and allowed it to be occupied and used by PRC as a model home to show prospective homeowners.
Summary judgment motions are governed ’’by the standards articulated by the New Jersey Supreme Court in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 666 A.2d 146, (1995); R. 4:46-2. The “judge’s function is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.” Id. at 540, 666 A.2d 146. According to the Court,
[W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party. This assessment of the evidence is to be conducted in the same manner as that required under Rule 4:37-2(b).
[Id. at 523, 666 A.2d 146],
*471 The express import of the Brill decision was to “encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.” Id. at 541, 666 A.2d 146.
The city claims that the “new” allegations which necessitate discovery are contained in the affidavit of CRDA’s Director of Finance, the supplemental affidavit of its staff counsel, and the reply brief. CRDA’s Director of Finance certified the following: (1) although the projected budget attached to the Stage II of Developer’s Agreement reflects among the sources of financing the figure of $150,000 as “Developer Equity” towards the $7 million costs, the developer did not contribute any additional funds and did not receive a return or reimbursement of any funds, (2) based on actual costs and sales prices for the housing units in the project, CRDA’s final subsidy was less than projected in the budget, and (3) the net sales proceeds of each unit of housing were applied to the construction mortgage with Bank of New York and the balance was payable to CRDA to reduce its subsidy in the project, with no proceeds payable to PRC, except for some minor reimbursements of actual incidental closing costs. CRDA’s staff counsel certified that the sole purpose of structuring the transaction so that title to the housing units passed simultaneously from CRDA to PRC and from PRC to the individual homeowners was to put PRC in the chain of title for the purpose of providing the homeowners with a right of direct enforcement of the homeowner warranties against PRC since it had constructed the housing units.
The gist of the city’s argument for defeating summary judgment is that it needs to obtain and review the construction loan documents to determine whether PRC was personally liable and what the understanding of the bank and PRC was as to PRC’s interest in the site. The city claims this information is necessary to support its theory that CRDA’s interest in the land was “equitably converted” to PRC upon the execution of the Developer’s Agreements. This court rejects the city’s argument. The city’s request for additional discovery is merely a “red herring.” The majority of the concerns raised in the city’s letter withdraw *472 ing its summary judgment motion are with statements made by CRDA’s counsel in his reply brief, which, to the extent they are not supported by the affidavits, documents, and reasonable inferences therefrom, are not evidential. CRDA’s reply affidavits do not modify any material facts contained in the Developer’s Agreements. For example, a construction mortgage is listed in the projected budget as a method of financing, the relationship between CRDA and PRC, the compensation to PRC for its services, the transfer of title with homeowner warranties, and the disbursement of the sales proceeds, are set forth at length in the Agreements and supporting documents. The parties’ initial submissions, as well as CRDA’s reply affidavits, when viewed in the light most favorable to the municipality with all legitimate inferences therefrom, do not raise genuine issues of material fact or present a sufficient disagreement to require submission of this matter for trial. As the court can make a determination as to whether the subject properties are statutorily exempt based upon the undisputed evidence before it, the matter is ripe for summary judgment.
In order to achieve the beneficial purposes of the Act, the Legislature provided that all property owned by CRDA would be exempt from taxation. N.J.S.A. 5:12-167 specifically provides:
All property of the Casino Reinvestment Development Authority is declared to be piiblic property devoted to an essential public and governmental function and purpose and shall be exempt from all taxes and special assessments of the State or any subdivision thereof.
[(emphasis added).]
N.J.S.A. 5:12-38.1 defines “property” as “[r]eal property, tangible and intangible personal property, and rights, claims and franchises of every nature.”
The issue before the court is whether the subject parcels of land, with improvements, which were constructed and marketed by PRC, and in one ease sold, and in the other case used and occupied by PRC as a model home for showing to prospective customers, were “property of CRDA” within the meaning of N.J.S.A. 5:12-167 during the relevant time periods and, as such, statutorily exempt from taxation for the 1998 tax year. It is undisputed that CRDA had legal ownership of both parcels as of *473 October 1, 1997, the valuation date for the 1998 tax year and that CRDA retained legal ownership of Lot 102.11 throughout the 1998 year. N.J.S.A. 54:4-63.28 provides that if the right to tax exemption ceases in any tax year, the property is to be assessed and taxed “as of the first day of the month following the date when the right to exemption ceased, for the proportionate part of the said year then remaining.” Since Mrs. Kwaw purchased Lot 102.10 on September 9, 1998, CRDA contends that the property should not have been assessed and taxed until October 1,1998.
CRDA submits that it had legal title to both the site and the units as of the requisite dates, and that it had the authority to acquire the parcels as part of a comprehensive redevelopment plan, subsidize the Madison Landing project, and enter into agreements for the construction, marketing, and sale of safe and affordable housing. As such, CRDA contends that the subject properties are statutorily exempt from local property taxation until their sale and, therefore, summary judgment should be granted in favor of CRDA. The city contends that the court should apply the doctrine of equitable conversion so that the subject land and improvements ceased to be exempt property of CRDA upon the execution of the Developer’s Agreements. Even if the land is considered to be owned by CRDA, the city’s alternative position is that its development is outside of the scope of CRDA’s authority and its use by PRC, which the city contends is in conjunction with a development activity conducted for profit, deprives CRDA of its exemption from local property taxation for the subject properties.
The city contends that the Developer’s Agreements constituted an agreement by CRDA to convey the subject project sub-divided site to PRC upon the sale of residential units constructed thereon. The city submits that CRDA held legal title as trustee for the “purchaser” PRC and as security for the payment of the construction loan and construction subsidy. As such, according to the city, the court should apply the doctrine of “equitable conversion” to enforce the agreement and convert PRC’s interest to real estate and CRDA’s interest to personalty. The city’s position is that the *474 transfer occurred, at the latest, when the Stage II of Developer’s Agreement was signed. At that time, the city contends, the interest in the subject properties ceased to be property of CRDA within the meaning of N.J.S.A. 5:12-167 and the subject properties became subject to real property taxation.
It is settled law that a contract for the sale of lands operates as an equitable conversion. Coolidge & Sickler, Inc. v. Regn, 7 N.J. 93, 98, 80 A.2d 554 (1951). The doctrine of equitable conversion was discussed in Cropper v. Brown, 76 N.J.Eq. 406, 74 A. 987 (Ch.1909). Chancellor Garrison stated:
Under the familiar doctrine that equity considers as done that which was agreed to be done, a contract for the sale of land operates as an equitable conversion. The vendee takes an equitable title, and his interest under the contract becomes realty; in case of his death before the conveyance is made the title descends to his heirs; he is entitled to all the benefits attaching to the property, and must bear all losses, unless the contract shows a contrary intention on the part of the parties; he may execute a valid mortgage or deed of the property; and is entitled to the usual benefits attaching to the ownership of the property, subject, however, to the rights of the vendor, who holds the legal title as security for the payment of the purchase money. Conversely, the vendor’s interest constitutes personalty, and on his death is distributable as such. He holds the legal title as trustee for the purchaser and as security for the payment of the purchase money ... The doctrine will not be applied where it is apparent from the contract that' the patties intended that it should not operate as an equitable conversion. Neither will it be applied where the contract is one the specific performance of which cannot be enforced. The conversion takes place at the time of the execution of the contract, even though the purchaser does not take possession or pay the purchase price; though in some cases where the decisions were based on the language of the particular contracts, it was held that the equitable title did not pass until the performance of certain conditions.
[Id. at 420-21, 74 A. 987 (citation omitted) (emphasis added) ].
As quoted by Vice Chancellor Jayne, “ ‘[ejquitable conversion may be defined as that constructive alteration in the nature of property whereby, in equity, real estate is considered for certain purposes as personalty, or vice versa.... It is a mere fiction resting upon the principle that equity regards things which are directed to be done as having actually been performed where nothing has intervened which ought to prevent such a performance’ ” Fidelity-Philadelphia Trust Co. v. Harloff, 133 N.J.Eq. 44, 56, 30 A.2d 57 (Ch.1943) (citations omitted) (emphasis added).
*475 Although the city requests that this court extend the doctrine of equitable conversion in order to bring the subject properties within reach of the laws of real property taxation, it has offered no justification for this court to apply the equitable doctrine to the law of real property taxation. Furthermore, the city is seeking to impose upon the parties to the contracts an immediate equitable “transfer of title” which neither party to the contract intended and which is inconsistent with the express provisions of the Developer’s Agreements. The retention by CRDA of a contractor with experience in housing projects to act, for a fee, as CRDA’s agent in obtaining the necessary site plan approvals, site preparation, housing construction, and marketing, clearly was not intended by the parties to transfer, nor does it result in a transfer of, title to the project site to the contractor. The city overlooks the fact that CRDA retained all incidents of ownership to the project, including land and improvements, as well as control over disbursement of the sales proceeds; that PRC had no interest in the sales proceeds and the amount and payment of its fee was not contingent upon the sale of the units; and that the Developer’s Agreement expressly provided for the transfer of each of the improved lots to PRC with a simultaneous conveyance to the purchaser. The requirement in the Agreement that PRC, as the developer of the project, purchase protection and warranties under the New Jersey Homeowners Warranty Act (“HOW” Warranties) and assign all manufacturer warranties to the purchaser, is a clear indication of the reason for the tri-partite conveyance.
 As stated by then Judge (later Chief Justice) Weintraub in N.J. Highway Auth. v. Henry A. Raemsch Coal Co., 40 N.J.Super. 355, 361, 123 A.2d 83 (Law Div.1956):
That concept [the doctrine of equitable conversion] was devised to assure justice between the parties to a real property transaction. It is a fiction of law, and, as such, cannot be extended beyond the special pmposes which it was created to save. It does not transmute a fund into real estate so as to subject the land to taxation as real property. The land remains land and the fund remains personalty insofar as subsequent local taxation is concerned.
[(emphasis added).]
*476 The doctrine of equitable conversion is most frequently applied in suits for specific performance and in solving questions concerning the validity and execution of trusts and other similar purposes. City of Newark v. Central and Lafayette Realty Company, Inc., 150 N.J.Super. 18, 22, 374 A.2d 504 (App.Div.), certif. denied, 75 N.J. 528, 384 A.2d 508 (1977). In no reported case has the doctrine been used in this State to subject property to taxation.
The Appellate Division dealt with the issue of whether a tax regulation, providing that the doctrine of equitable conversion should apply to estates of New Jersey decedents involving New Jersey realty so as to subject them to tax, exceeded the Division of Taxation’s authority to promulgate regulations. The court held “that the doctrine of equitable conversion should not be applied to resolution of issues of taxation.... Contrary to prior law it would tax interests in real property which had hitherto been deemed exempt under proper construction of the statute.” In the Matter of the Estate of Houghton, 147 N.J.Super. 477, 485, 371 A.2d 735 (App.Div.1977), aff’d. 75 N.J. 462, 383 A.2d 713 (1978). According to the court, “[Tjaxes should be levied upon realities, not upon fictions.” Id. at 482, 371 A.2d 735 (citations omitted). “In McCurdy v. McCurdy, [197 Mass. 248] 83 N.E. 881, 882 (Mass.1908), ... it was stated ‘the law of equitable conversion ought not to be invoked merely to subject property to taxation.’ ” Id. at 483, 371 A.2d 735. Although the cases cited concern different forms of taxation, the logic to expressed by the Appellate Division dictates that the same result should be reached by this court. As such, the court will not invoke the doctrine of equitable conversion for the purposes of subjecting the subject properties to taxation.
The city also argues that the project is outside of the scope of CRDA’s powers and is operated by a private party in conjunction with a development activity conducted for profit. As such, according to the city, the subject properties lose them tax exempt status. The city relies predominantly upon Judge Rimm’s recently published opinion in Renaissance Plaza v. Atlantic City, 18 N.J.Tax 342 (Tax 1998) in support of its position that CRDA is a financing and investment agency and there is nothing in the Act which *477 authorizes CRDA to operate as a developer, although it acknowledges that the case is factually inapposite to the one before this court. In further support of its position, the city refers to N.J.S.A. 54:4-1.10, which provides for the assessment and taxation of real property which is otherwise exempt, if it is used by a private party in connection with an activity conducted for profit. According to the city, the Madison Landing project was developed by a private entity for profit purposes and the units themselves were to be sold to private persons for private use.
The court must first determine if CRDA has the power to undertake the development project at issue here. As a general background matter, it should be kept in mind that “[tax] exemptions in favor of governmental agencies should be liberally construed.” Walter Reade, Inc. v. Dennis Tp., 36 N.J. 435, 440, 177 A.2d 752 (1962) (citations omitted).
The court finds that CRDA had the express authority to take the steps it took to acquire and develop the Madison Landing residential subdivision. CRDA, as its statutory name indicates, is a development authority whose purposes include facilitating the development of existing blighted areas and financing various public interest projects in Atlantic City, through such methods as providing loans and other financial assistance for the construction and rehabilitation of buildings to provide safe and sanitary dwelling units for persons of low, and moderate income. N.J.S.A. 5:12-160. See also 214 Corp. v. Casino Reinvestment Development Authority, 280 N.J.Super. 624, 626, 656 A.2d 70 (Law Div.1994). CRDA was given broad powers to facilitate its discharge of statutory responsibilities, including eminent domain, acquiring and disposing of any eligible project in which it was making an investment, and entering into contracts or agreements to carry out its purposes. N.J.S.A. 5:12-161, State of New Jersey v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 734 A.2d 1160 (1999).
The city contends that CRDA’s contracting with a private party to develop low, moderate, and medium income housing units for sale to residents is outside of its powers and does not serve a *478 public purpose. The city’s interpretation cannot be further from the plain language of N.J.S.A. 5:12-160 and 161' and the relevant case law. As evidenced by CRDA’s resolutions and the Developer’s Agreement, a portion of the housing units developed were targeted as low and moderate income residences. In addition, this project provides a significant benefit to the city — it redevelops a blighted area with an eroded tax base and provides significantly higher tax ratables within a reasonable construction period. Thus, CRDA’s undertaking and development of this project falls squarely within the legislative purpose for its establishment.
This court finds that PRC was carrying out a public purpose on the property envisioned by the Legislature. CRDA maintained total ownership and control of the property from the time of acquisition of the land to the sale of the improved parcel. PRC’s sole interest in the property was as CRDA’s agent to develop and market the project. The property was not operated as a commercial enterprise. Contrary to the city’s statement, the Madison Landing project was not developed by PRC for profit purposes. In addition to the acquisition of the land, the project required a substantial subsidy by CRDA to bridge the gap between the construction costs and an “affordable” sales price for low, moderate, or middle income persons. Furthermore, under the terms of the Developer’s Agreements, PRC received compensation for its services in obtaining approvals, acting as a general contractor in developing the project, and in marketing the units in a similar manner as the other contractors. It had no pecuniary interest in the sale of the units, other than a potential “developer’s bonus” of up to $2000 per unit, paid at the close-up of the project at the sole discretion of CRDA. PRC did not receive funds from the sale of the subject properties, other than reimbursement for some minor, actual incidental closing costs. But see Renaissance Plaza Assoc., L.P. v. Atlantic City, supra, 18 N.J.Tax 342 (Tax 1998). In that case Judge Rimm held that property owned by CRDA which was leased to a private entity for ninety-nine year’s and operated as a shopping mall with anchor supermarket was not exempt under N.J.S.A. 5:12-167 because the lease was tantamount to transfer of ownership. Furthermore, in dicta, 'Judge Rimm narrowly eon *479 strued the authority and public purpose of CRDA, stating that “CRDA is a financing and investment agency, not a developing agency.” (18 N.J.Tax. at 357). As the foregoing analysis reflects, this court finds the scope of CRDA’s enabling statute to be less restrictive.
“The concept of public purpose is a broad one. Generally speaking, it connotes an activity which selves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society.” Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834 (1964).
The subject properties were owned by CRDA for local property tax purposes on October 1, 1997 and are, therefore, exempt from taxation under N.J.S.A. 5:12-167. Summary judgment will be granted in favor of the plaintiff, CRDA, as set forth below. Since CRDA retained ownership of Lot 102.11 for the entire 1998 year, the property is exempt from local property taxation for the 1998 tax year. Lot 102.10 was purchased by Adele Kwaw on September 9, 1998, and, therefore, pursuant to N.J.S.A. 54:4-68.28, the property became subject to assessment and local property taxation as of October 1, 1998. Accordingly, an omitted added assessment will be imposed on lot 102.10 for October, November, and December of 1998, pursuant to N.J.S.A. 54:4-68.26, as follows:
Land $ 25,200
Improvements $ 75,800
Total $101,000
Number of months 3
Prorated Assessment $ 25,250