NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0019-16T1

CASINO REINVESTMENT
DEVELOPMENT AUTHORITY,
a public corporate body of the
State of New Jersey,

 Plaintiff-Appellant/
 Cross-Respondent,

v.

CHARLES BIRNBAUM and
LUCINDA BIRNBAUM,

 Defendants-Respondents/
 Cross-Appellants,

and

LOUIS TAYLOR DAVIS, GERALD
GITTENS, THE ATLANTIC CITY
MUNICIPAL UTILITIES
AUTHORITY, THE ATLANTIC
CITY SEWERAGE CO., and THE
CITY OF ATLANTIC CITY,

 Defendants.

_____

> **APPROVED FOR PUBLICATION**
>
> **February 15, 2019**
>
> **APPELLATE DIVISION**

Argued October 24, 2018 – Decided February 15, 2019

Before Judges Koblitz, Ostrer and Currier.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0589-14.

Stuart M. Lederman argued the cause for appellant/cross-respondent (Riker Danzig Scherer Hyland & Perretti LLP, attorneys; Stuart M. Lederman, of counsel; Rudy S. Randazzo, Kellen Murphy, and Katherine Nunziata, on the brief).

Robert J. McNamara (Institute for Justice) of the Virginia bar, admitted pro hac vice, argued the cause for respondents/cross-appellants (Potter and Dickson, Robert J. McNamara and Daniel L. Alban (Institute for Justice) of the Virginia bar, admitted pro hac vice, attorneys; Peter D. Dickson, on the brief).

Adam M. Gordon, attorney for amicus curiae Fair Share Housing Center.

Mark Miller, attorney for amicus curiae Pacific Legal Foundation.

The opinion of the court was delivered by

KOBLITZ, P.J.A.D.

Plaintiff Casino Reinvestment Development Authority (CRDA) appeals from the August 5, 2016 dismissal of its complaint for condemnation of a residential property in the city of Atlantic City owned by defendants Charles and Lucinda Birnbaum. The CRDA sought to condemn the Birnbaum property in furtherance of its mandate to promote tourism in Atlantic City. The property is located in the Atlantic City Tourism District, within the boundaries of the

CRDA's South Inlet Mixed Use Development Project (Project), where the CRDA proposes private, economic redevelopment, including the construction of tourism-focused residential, retail, and commercial uses.

At the time of the decision under review, the CRDA had no specific redevelopment plans under consideration for the Project; it had not issued a request for proposals (RFP) to prospective developers, and no developer had committed to redeveloping within the Project area. Nevertheless, the CRDA maintains it had a right to "bank" the Birnbaum property for redevelopment at some unspecified time in the future. Atlantic County Assignment Judge Julio Mendez dismissed the condemnation complaint as a manifest abuse of power because the CRDA did not provide reasonable assurances that the proposed redevelopment would come to fruition in the foreseeable future. The CRDA appeals from that judgment. We affirm.

The Birnbaums cross-appeal from an earlier, November 17, 2014 determination that the condemnation was for a sufficiently specific public use and the Birnbaum property was reasonably included in the Project area. At that time the judge also held that the CRDA was taking the property to promote tourism and therefore was not required to comply with the Blighted Areas Clause of the New Jersey Constitution, N.J. Const. art. VIII, § 3, ¶ 1. But, Judge

Mendez found, in any event, the taking did comply with those requirements. We need not reach the cross-appeal.

## I. Legal Framework

In 1976, a constitutional amendment authorized casino gambling in Atlantic City. N.J. Const. art. IV, § 7, ¶ 2(D). Eight years later, the Legislature created the CRDA, in, but not of, the Department of the Treasury. N.J.S.A. 5:12-153. See In re Plan for Abolition of Council on Affordable Hous., 214 N.J. 444, 448 (2013) (explaining significance of "in, but not of" designation). The statutory purposes of the agency are set forth at N.J.S.A. 5:12-160, and include "directly facilitat[ing] the redevelopment of existing blighted areas," N.J.S.A. 5:12-160(a), and "encourag[ing] investment in, or financing of, projects which are made as part of a comprehensive plan to improve blighted or redevelopment areas . . . ." N.J.S.A. 5:12-160(k).

New Jersey courts have recognized that "[t]he general purpose of the [CRDA] is to manage the proceeds received under N.J.S.A. 5:12-144.1 and 5:12-162 and to direct the rehabilitation of blighted areas of Atlantic City." In re Casino Licensee, 224 N.J. Super. 316, 323 (App. Div. 1988) (citing N.J.S.A. 5:12-160 and 5:12-161); see also Barbara Nash Westcott, Note, Dealing a Fair Hand to Atlantic City Property Owners, 31 Rutgers L.J. 913, 921-23 (Spring

2000) (describing CRDA's funding sources). The CRDA is a "financing and investment agency" that facilitates redevelopment projects, but does not act as a developer or operator. CRDA v. City of Atl. City, 18 N.J. Tax 463, 476-77 (1999).

As set forth in N.J.S.A. 5:12-160, the purposes of the CRDA include:

> k. to encourage investment in, or financing of, projects which are made as part of a comprehensive plan to improve blighted or redevelopment areas or are targeted to benefit low through middle income residents of the jurisdiction or region in which the investments are to be made . . . .
>
> [(emphasis added).]

The CRDA was granted the power "[t]o exercise the right of eminent domain" in Atlantic City. N.J.S.A. 5:12-161(p). N.J.S.A. 5:12-182 states in pertinent part:

> a. The Legislature finds and declares that the achievement of the beneficial purposes of this 1984 amendatory and supplementary act requires the granting to the [CRDA] of the right of condemnation and the exercise by it of the right of eminent domain in the city of Atlantic City because special problems may arise or exist in that city concerning the necessity for the acquisition of the property for projects for the public good under this 1984 amendatory and supplementary act, including inflated land values resulting from speculation and intentional obstruction of a landowner or speculator to the acquisition of

needed property in order to exact an unreasonable and prohibitive purchase price.

b. In the event the [CRDA] finds it is necessary to complete a project in the city of Atlantic City, the authority may acquire any real property in the city, whether a fee simple absolute or lesser interest and whether for immediate use, that the authority may find and determine is required for public use, and upon such a determination, the property shall be deemed to be required for a public use until otherwise determined by the authority; and with the exceptions hereinafter specifically noted, the determination shall not be affected by the fact that such property has theretofore been taken for, or is then devoted to, a public use, but the public use in the hands or under the control of the authority shall be deemed superior to the public use in the hands or under the control of any other person, association or corporation.

c. If the [CRDA] is unable to agree with the owner or owners thereof upon terms for the acquisition of any such real property in the city for any reason whatsoever, then the authority may acquire, and is hereby authorized to acquire, after consultation with the appropriate agency of the city by way of notification 30 days prior to the filing of condemnation proceedings, such property, whether a fee simple absolute or lesser interest, by condemnation or the exercise of the right of eminent domain pursuant to the provisions of the "Eminent Domain Act of 1971," . . . and the "Relocation Assistance Act," . . . .

[(emphases added).]

The 2001 CRDA Urban Revitalization Act, N.J.S.A. 5:12-173.9 to -173.20, established an "incentive program," administered by the CRDA, "to

6

facilitate the development of entertainment-retail districts for the city of Atlantic City . . . ." N.J.S.A. 5:12-173.12(a). Ten years later, the Legislature adopted the Atlantic City Tourism District Act (Tourism Act), N.J.S.A. 5:12-218 to -233, which gave the CRDA power "to establish and exercise authority over the Atlantic City Tourism District. . . ." N.J.S.A. 5:12-160(m) and 5:12-161(q). The CRDA also was required to develop a Tourism District Master Plan. N.J.S.A. 5:12-219(e).[1]

At the same time, under N.J.S.A. 5:12-220(f), Atlantic City was prohibited from "designat[ing] the tourism district or any portion thereof as an area in need of redevelopment or an area in need of rehabilitation, or adopt[ing] a redevelopment plan for any property within the tourism district pursuant to the 'Local Redevelopment and Housing Law' . . . (N.J.S.A. 40A:12A-1 to -73 [LRHL]) without the consent of the [CRDA]."

---

[1] The Municipal Land Use Law defines a "master plan" as "a composite of one or more written or graphic proposals for the development of the municipality," N.J.S.A. 40:55D-5, and prescribes the contents of a master plan at N.J.S.A. 40:55D-28.

## II. Relevant CRDA Resolutions

In 2011, pursuant to the Tourism Act of the same year, the CRDA created the Tourism District in Atlantic City.[2] Thereafter, in February 2012, by Resolutions 12-14 and 12-23, the CRDA adopted a Tourism District Master Plan, which called for redevelopment of several areas of the city, including the Inlet District.[3]

In May 2012, the CRDA issued Resolution 12-68, which preliminarily determined that the Project was of the type and character eligible for approval under N.J.S.A. 5:12-173,[4] and authorized further action including holding a

---

[2] A map of the Tourism District can be found at AC Tourism District, Casino Redevelopment Authority, https://www.njcrda.com/ac-tourism-district (last visited Feb. 4, 2019).

[3] A copy of the 2012 Tourism District Master Plan, as well as the updated 2017 Tourism District Master Plan, can be found on the CRDA's website. Id. at Master Plan, https://www.njcrda.com/ac-tourism-district/master-plan (last visited Feb. 4, 2019).

[4] N.J.S.A. 5:12-173 states, in pertinent part:

> The [CRDA] shall have the power to invest in projects, in the form of equity investments or loans, or a combination of both, and to approve direct investments in the form of equity investments or loans, or a combination of both, by licensees in projects which best serve the public interest, which are in furtherance of the public purposes set forth in section 12 of this act and

A-0019-16T1

public hearing.  The CRDA described the Project as being "constructed in phases that complement the new Revel Casino and assist with the demands created by the resort."

The CRDA also stated that "[p]rior to implementation of the project," certain privately owned properties would have to be acquired, and addressed funding for the Project, stating:

> Prior to implementation of the project, land acquisition of sixty two (62) low rise units, and certain privately owned adjoining parcels including vacant and improved properties on Blocks 68, 70, and 72, acquisition of certain properties within Blocks 128 through 131, relocation, demolition and site remediation must take place.  The estimated real estate costs . . . are . . . up to $25 million. . . .  Upon completion of acquisition and relocation, the CRDA staff will work with potential partners to develop the land for restaurant, residential and retail use.  The source of funds will be the CRDA's Tourism District and Community Development Fund for initial professional fees . . . .  <u>The balance of the needed funds will be derived from use of Revel investment obligations</u>.

---

> which promote the health or social or economic well-being of the people of this State and, in particular, of the residents of the local governmental unit in which the investment is being made. . . . No project shall be financed by the [CRDA] by investment, guarantee or repurchase of bonds nor shall a licensee commence a direct investment unless the project has been determined to be an eligible project meeting the criteria.  The determination shall be made only after a public hearing . . . .

9

[(emphasis added).]

In June 2012, the CRDA formally approved the Project, by Resolution 12-82, which stated:

> The [Project] serves the public interest, furthers the public purposes of the CRDA set forth in [N.J.S.A. 5:12-160], and promotes the health or social or economic well-being of the people of the State and, in particular, of the residents of the local government unit affected by the project, and is therefore an approved project.

By the same resolution, the CRDA authorized the Executive Director to acquire properties in the Project area through purchase or eminent domain, and approved a fund reservation for pre-acquisition costs and fees in furtherance of the Project. On the same date, the CRDA adopted Resolution 12-83, permitting it to negotiate and execute a memorandum of understanding with the New Jersey Economic Development Authority, related to funding of the Project.

In various meeting notes and resolutions from May and June 2012, the CRDA acknowledged the Revel Casino's deep involvement in the Project: the CRDA anticipated entering into a public–private partnership agreement with the Revel Casino; the casino had "presented to the CRDA and other Atlantic City stakeholders certain conceptual plans for improvement of the Atlantic City Inlet Neighborhood Strategy Area, which plans may serve as a possible template for

A-0019-16T1

potential future development of the Inlet District"; and funds for the Project were to be generated by receipts from the Revel Casino, with the Revel Economic Redevelopment and Growth Grant incentive viewed as "an innovative use of anticipated future tax revenues from a casino project to complete an otherwise stranded development project and to fund needed infrastructure and community enhancements in the South Inlet area."

### III.    The Birnbaum Property

The Birnbaum property is a three-story building located at Block 72, Lot 3 in Atlantic City, within the Project area, between the Revel Casino and the Absecon Lighthouse.  On CRDA maps, the Birnbaum property is located in a "land bank area" slated for "future development."

Abe Birnbaum and Dora Rotstein purchased the property in 1969.  Upon Abe's death in 1987, Dora transferred ownership of the property to their son, Charles Birnbaum, and his wife Lucinda.  Dora continued to reside on the first floor of the home with a live-in companion, and Charles rented out the two upper floors.  Dora lived there until November 1998, when she and her companion were killed during a home invasion.  Since his mother's death, Charles has continued to rent out the upper floors of the property.  He uses the first floor as

11

a base of operations for his piano tuning business, a piano studio, and a memorial to his parents.

The Birnbaum property is one of the last buildings left on its block. The land across the street has been primarily vacant for the past fifteen-to-eighteen years. In June 2013, the CRDA attempted to acquire the Birnbaum property through negotiation, offering $238,500. The Birnbaums disputed the CRDA's authority to take their property.

## IV.  Litigation

In February 2014, the CRDA filed a verified complaint in condemnation, seeking a judgment that the CRDA had duly exercised its power of eminent domain, and asking the judge to appoint condemnation commissioners to make a just and equitable appraisal of the Birnbaum property. The judge ordered the CRDA to deposit the $238,500 anticipated just compensation into the court. The Birnbaums moved for a plenary proceeding.

In opposing the motion, the CRDA advised the judge that properties, including the Birnbaum property, were being acquired for the Project "to assemble a development-ready parcel of land . . . to spark the statutorily required investment in the Tourism District." The CRDA had a redevelopment concept, but no specific plans, nor any agreements with developers. Rather, at an

12

unspecified time, after a "massing plan" had been approved by the CRDA's Board, the CRDA would put the Project out for public bid.

Counsel for the Birnbaums filed a supplemental certification, advising of a bankruptcy filing by the Revel Casino. Counsel argued that the bankruptcy placed in doubt the CRDA's plans for the Project and undermined its justification for condemning the Birnbaum property. In a June 2014 order, the judge denied the Birnbaums' motion for a plenary hearing and allowed the case to proceed in a summary fashion. In a November 17, 2014 order, the judge granted the CRDA's application to exercise its power of eminent domain, and denied the Birnbaums' motion to dismiss the complaint.

The Birnbaums filed a motion for reconsideration, advising the judge that on November 12, 2014, the Governor's Advisory Commission on New Jersey Gaming, Sports, and Entertainment had issued a report proposing major changes to the Atlantic City Tourism District and to the CRDA's funding and authority. The report recommended: redirecting and reallocating certain funds away from the CRDA in order to meet the city's pressing needs; funding a new not-for-profit development company, the Atlantic City Development Corp., with a mission that would include serving as a land bank, acquiring blighted properties and demolishing existing structures, as well as planning, financing, and

developing mixed-use redevelopment projects; having the CRDA assume responsibility for zoning, planning, and code enforcement in Atlantic City; concentrating revitalization efforts into five key areas of Atlantic City, which did not appear to include the Birnbaum property; and expanding the Tourism District to include the entire city of Atlantic City.

The judge in part granted the motion for reconsideration. He maintained his rulings that a valid public purpose existed for taking the Birnbaum property ("promoting tourism and assisting the ailing gaming industry"), and the CRDA had provided sufficient specificity regarding the proposed use for the Birnbaum property through its Tourism District Master Plan and description of the Project. But, Judge Mendez found that "there must be a reasonable assurance that the proposed plans will be implemented." He reasoned: "[O]ur Legislature did not intend, and the Constitution does not permit, property to be acquired and to remain idle indefinitely, without a reasonable assurance that the proposed plan to justify the taking will be implemented."

Given the proposed legislation that would reduce the CRDA's revenue, as well as the dire economic situation in Atlantic City, the Revel Casino bankruptcy, and several unsuccessful past efforts to revitalize the South Inlet area in which the Birnbaum property is located, the judge was concerned that

the CRDA was unprepared to proceed with the Project, and it was no longer viable. In August 2015, the judge gave the CRDA six months to submit a certification after reevaluating "the feasibility of the proposed project":

> [T]he CRDA is not authorized to condemn the Birnbaum property until the [c]ourt has reasonable assurances that the proposed use, justifying the taking of the Birnbaum property, will be implemented.

In April 2016, at the request of the CRDA, the judge held a hearing, taking testimony from John Palmieri, Executive Director of the CRDA, Mary Rixey, the CRDA's Director of Real Estate and Development, Paul Weiss, Chief Legal Officer for the CRDA, Lance Landgraf, the Director of Planning at the CRDA, and Charles Birnbaum, who testified regarding his ownership and use of the property.

Palmieri and Rixey testified that the CRDA works within the Tourism District boundaries "to focus on traditional redevelopment activities, acquisition, remediation, installation of infrastructure, assemblage of parcels for private sector development, supporting programming having to do with public relations and events, and in maintaining a clean and safe environment for the District . . . ." The CRDA also owns and manages the Convention Center and Boardwalk Hall.

15

Regarding the Project, Palmieri, Rixey and Weiss testified that the CRDA installed parks and roadway improvements, but primarily assembled property for later disposition through public-private partnership activities. See N.J.S.A. 5:12-233 (authorizing CRDA to enter into public-private partnerships). Once the property is assembled, the CRDA plans to "encourage mixed use development," including retail, restaurants, and housing, with the goal of "reclaim[ing] a District that hasn't seen any investment, very little, over the past 40 or 50 years, and to create a new neighborhood with those kinds of mixed uses that would make it vibrant and create jobs, and improve property values."

According to Palmieri, Rixey and Weiss, the CRDA already had dedicated funding for the land assemblage phase of the Project. Therefore, any future changes in the CRDA's funding sources would not affect its ability to complete that phase, and the sole remaining parcel to be acquired and demolished was the Birnbaum property. On cross-examination, Palmieri admitted that initially the Project had been intended to complement the Revel Casino, with the casino providing a revenue source. The Revel Casino, however, ceased operations in September 2014.

Palmieri and Weiss further admitted that the CRDA's expenditures of funds for redevelopment was not limited to the acquisition and massing of land.

The CRDA also used funds to "incentivize" development, which would be relevant to the next stage of the Project, when the CRDA would solicit developers' proposals and work on a disposition program, using its draft massing plan. The CRDA Board had not yet approved the draft massing plan, which had not been altered since May 2014, when the Revel Casino was still operating. The CRDA had engaged in discussions with potential developers and prepared a draft RFP. However, the "RFP process was essentially put on hold given the pendency of this matter."

In August 2016, Judge Mendez denied the CRDA's application to condemn the Birnbaums' property, and dismissed the complaint. The judge found that the CRDA's statutory condemnation authority is not unlimited. He found the CRDA is not authorized under N.J.S.A. 5:12-182 "to bank land in the hopes that it will be used in a future undefined project," and "the CRDA is not empowered to condemn a property only to have it sit idly, potentially for years on end, as they wait for [the] right project to present itself." While the judge acknowledged the CRDA's "good intentions" for redevelopment, he found that the CRDA had "only an idea" and a "conceptual plan" for the Project. It had no viable plan that was "likely to occur within the foreseeable future." Rather, the CRDA was "banking land in the hopes of attracting a developer at some future

point in time," but no such project currently existed. On the record presented, there was no reasonable assurance that the Birnbaum property would be "put to a public use within the next year or the next ten years." Thus, the judge found that the proposed taking was unjustified.

The judge's opinion was informed by the location of the Birnbaum property, Atlantic City's unprecedented financial downturn, and the CRDA's past failures to develop Inlet properties it had taken in condemnation. The judge found the Birnbaum property was located in an area of the city particularly hard hit by the economic downturn, near two shuttered casinos. It had been the site of "many failed revitalization attempts," such that "many of the surrounding properties . . . sit vacant waiting for a project to come forward."

The judge also noted that the CRDA's statutory authority to bank land under N.J.S.A. 5:12-182 had been driven by the Legislature's concern over land speculation and inflated property values. Those issues were not present with property values in Atlantic City decreasing.

Finally, the judge noted recently passed legislation, which added to the uncertainty surrounding the Project. In particular, the CRDA had lost a portion of its funding, with the investment alternative tax diverted away from the CRDA

to the city.  See N.J.S.A. 52:27BBBB-25.[5]  The money available for the CRDA to proceed with the Project, which "may still require additional funds" to incentivize development, was now limited, which would make "it more difficult to attract developers."

Ultimately, the judge concluded:

> [T]he [c]ourt holds that the CRDA has not provided reasonable assurances to justify the taking of the Birnbaums' property.  The [c]ourt finds that based on the current unprecedented financial crisis in Atlantic City, the unique location of the Birnbaums' property, the history of unsuccessful economic development projects in this area of Atlantic City, [and] the lack of any specific and viable plans of the use of this property . . . the CRDA's decision to condemn the Birnbaums' property is a manifest abuse of the eminent domain power and . . . is not consistent with the statutory condemnation authority of the CRDA.

## V. Condemnation issues

The CRDA argues that it satisfied its burden of proof on its right to condemnation by establishing a public purpose for the taking and providing due process and just compensation to the Birnbaums.  It argues the judge erred by requiring assurances that the Birnbaum property would be put to public use

---

[5]  N.J.S.A. 52:27BBBB-25, the Municipal Stabilization and Recovery Act (MSRA), redirects investment alternative tax proceeds from the CRDA to Atlantic City through December 31, 2026.

within a reasonable period of time.  Under the CRDA's reading of N.J.S.A. 5:12-182, it is empowered to condemn property for future public use unfettered by court consideration of whether or when the proposed redevelopment will occur.

Alternatively, the CRDA contests the judge's factual finding that the Project is unlikely to proceed in the foreseeable future.  The CRDA argues that the only impediment to soliciting a developer for completion of the Project is this litigation and, notwithstanding the reduction of future revenue pursuant to the MSRA, it can rely upon other funding sources, if necessary, to proceed with a public-private development agreement.

"Eminent domain is the power of the State to take private property for public use . . . ."  Twp. of W. Orange v. 769 Assocs., LLC, 172 N.J. 564, 571 (2002) (quoting State by McLean v. Lanza, 27 N.J. 516, 529 (1958)).  A reviewing judge will not overturn an exercise of eminent domain without affirmative proof of "fraud, bad faith, or a manifest abuse" of authority.  Ibid. (quoting Trenton v. Lenzner, 16 N.J. 465, 473 (1954)).  The trial judge's factual findings "are considered binding on appeal when supported by adequate, substantial and credible evidence," Rova Farms Resort v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974), while the trial judge's legal findings are reviewed de novo. Manalapan Realty v. Twp. Comm., 140 N.J. 366, 378 (1995).

The Legislature has delegated to the CRDA a statutory right to condemn property. N.J.S.A. 5:12-161(p) and 5:12-182. However, that right is constrained by the terms of the delegation, the Eminent Domain Act, N.J.S.A. 20:3-1 to -50, see N.J.S.A. 5:12-182(c), and the federal and state constitutions. U.S. Const. amend. V; N.J. Const. art. I, ¶ 1, ¶ 20; Hous. Auth. v. Suydam Inv'rs, 177 N.J. 2, 14 (2003).

The federal and state constitutions impose three limits on the State's use of the eminent domain power. "First, the State must pay 'just compensation' for property taken by eminent domain. Second, no person may be deprived of property without due process of law. Third, . . . the State may take private property only for a 'public use.'" Gallenthin Realty v. Borough of Paulsboro, 191 N.J. 344, 356 (2007) (citations omitted).

The issue here is whether the CRDA's finding that it is necessary to seize the Birnbaum's property for the proposed Project constitutes a manifest abuse of authority given the uncertainties about whether or when the Project will occur. It is well-established that redevelopment is a constitutionally permitted public use. N.J. Const. art. VIII, § 3, ¶ 1; Kelo v. City of New London, 545 U.S. 469, 484 (2005); 62-64 Main St. v. Mayor, 221 N.J. 129, 134, 144 (2015).

21

Courts have recognized that there are inherent uncertainties in the redevelopment process and found such uncertainties are insufficient to deny a complaint for condemnation. See, e.g., Bryant v. City of Atl. City, 309 N.J. Super. 596, 620-23 (App. Div. 1998) (concerning contingencies in redevelopers' agreement); Bd. of Educ. of Asbury Park v. Murnick, 224 N.J. Super. 504, 514 (App. Div. 1988) (concerning fitness of land for school purposes); State ex rel. Comm'r of Transp. v. Malibu Beach, Inc., 209 N.J. Super. 291, 297-98 (Law Div. 1986) (concerning need to obtain government permit).

Because the CRDA is a reinvestment entity, it acquires properties in condemnation with the expectation that a private developer will effectuate the public purpose by redevelopment, N.J.S.A. 5:12-161(a) and (k), N.J.S.A. 5:12-233, a multi-step process that takes time. See Renaissance Plaza v. Atlantic City, 18 N.J. Tax 342, 347, 357 (1998). Thus, the imposition of a strict timeline would be inappropriate.

Our recent case of Borough of Glassboro v. Grossman, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 3) offers guidance. We reversed a municipal condemnation sought for "future public parking" because no evidence was presented that it was necessary or reasonable. Id. at ___ (slip op. at 3). In Glassboro, we considered the term "necessary" in the context of condemnation

22

of property pursuant to the LRHL.  Id. at ___ (slip op. at 12-16).  We held that, when challenged, the condemning authority must:

> articulate a definitive need to acquire the parcel for an identified redevelopment project.  That articulated need must be more specific than the mere "stockpiling" of real estate that might, hypothetically, be useful for a redevelopment project in the future.  In addition, the condemning authority . . . must present to the court at least some evidence -- consisting of facts, expert opinion, or both -- that provides reasonable substantiation of the need.
>
> [Id. at ___ (slip op. at 2-3).]

We stated: "The burden of coming forward with evidence of reasonable necessity, in cases where necessity is contested, rests upon the plaintiff municipality or redevelopment agency."  Id. at ___ (slip op. at 25).

The CRDA takes the position that, as a legal matter, any uncertainties about whether or when the Project will proceed are irrelevant because under N.J.S.A. 5:12-182 it is permitted to acquire property "whether for immediate use."[6]  Thus, according to the CRDA, it is statutorily entitled to bank land for

---

[6] Statutes defining the condemnation power of several other public entities use the language "whether for immediate or future use," including: the New Jersey Sports and Exposition Authority, N.J.S.A. 5:10A-29; the New Jersey Meadowlands Commission, N.J.S.A. 13:17-34; condemnation for state colleges, N.J.S.A. 20:1-3.11; the Transportation Commissioner, N.J.S.A. 27:7-22; the Port Authority of New York and New Jersey, N.J.S.A. 32:1-35.9, -35.33, -35.63,

future public use, without any temporal limitation.  N.J.S.A. 5:12-182(b) sets

forth that:

> In the event the Casino Reinvestment Development Authority finds it necessary to complete a project in the city of Atlantic City, the authority may acquire any real property in the city, whether a fee simple absolute or lesser interest and whether for immediate use, that the authority may find and determine is required for public use . . . .
>
> [(emphasis added).]

Unlike the municipality in Glassboro, ____ N.J. Super. at ____ (slip op.

at 2), the CRDA has statutory authority to determine when a project is

"necessary."  The CRDA does not have unfettered discretion in defining what is

"necessary," however, because its actions are subject to review on the basis of

manifest abuse of power.  See Twp. of W. Orange, 172 N.J. at 571.

Manifest abuse of power is a factual determination.  See id. at 579.  In

Twp. of W. Orange, the Court found the township's proposed project did not

constitute a manifest abuse of power where it "amply demonstrated" with

specificity the public purpose of the project, even if another "viable alternative"

---

-35.85, -132, -141.2, N.J.S.A. 32:2-18, -23.13; the Delaware River Port Authority, N.J.S.A. 32:3-6; the Delaware River Joint Toll Bridge Commission, N.J.S.A. 32:8-4; the Gloucester County tunnel law, N.J.S.A. 32:13A-6; the Capital City Redevelopment Corporation, N.J.S.A. 52:9Q-24.

was available.  Ibid.  Similarly, in Trenton v. Lenzner, after analyzing the city's factual showing of necessity, the Court found "no basis whatever for inferring that the city's determination . . . was in anywise tainted by fraud or bad faith or constituted an abuse of its broad discretionary powers."  Trenton, 16 N.J. at 472-74.[7]

As we concluded in Glassboro when analyzing the term "necessary" in the LRHL, the language of necessity means "reasonably necessary."  Glassboro, ____ N.J. Super. at ____ (slip op. at 18).  Similarly, "whether for immediate

---

[7]  A number of out-of-state cases also employ a factual analysis in determining manifest abuse of power:  a North Carolina appeals court noted "[u]pon specific allegations tending to show bad faith, malice, wantonness, or oppressive and manifest abuse of discretion by the condemnor, the issue raised becomes the subject of judicial inquiry as a question of fact to be determined by the judge." Greensboro-High Point Airport Authority v. Irvin, 245 S.E.2d 390, 392 (N.C. Ct. App. 1978) (quoting Charlotte v. McNeely, 190 S.E.2d 179, 185 (N.C. Ct. App. 1972)).  A Washington appeals court similarly required a showing of "genuine need" for a project in reviewing a condemnor's decision for improper motive.  State v. Hutch, 631 P.2d 1014, 1018-19 (Wash. Ct. App. 1981).  There, the court noted the general rule that "the action of a public agency or a municipal corporation having the right of eminent domain in selecting land for a public use will not be controlled by the courts except for a manifest abuse of discretion, violation of law, fraud, improper motives, or collusion."  Id. at 1018 (quoting State ex rel. Tacoma Sch. Dist. v. Stojack, 330 P.2d 567, 572 (Wash. 1958)). The court stated "if examination of the facts and circumstances of the proposed condemnation demonstrates a genuine need and if in fact the condemnor intends to use the property for its avowed purpose, the condemnor's action cannot be arbitrary and capricious."  Id. at 1019 (emphasis added).

25

use" must be interpreted to imply a limitation of reasonably foreseeable future use rather than limitless future use.  A number of out-of-state cases support this view.[8]  We conclude here as we did in Glassboro that the proposed stockpiling of land for future redevelopment does not suffice to establish a taking is reasonably necessary.  Glassboro (slip op. at 19-20).

"Since Kelo was decided, greater judicial and legislative scrutiny of redevelopment-based takings has occurred."  Harrison Redev. Agency v. DeRose, 398 N.J. Super. 361, 411 (App. Div. 2008).  Although N.J.S.A. 5:12-

---

[8]  See, e.g., Adams v. Greenwich Water Co., 83 A.2d 177, 182 (Conn. 1951) ("On the question of the necessity of a taking, needs which will arise in the reasonably foreseeable future must be taken into consideration."); State ex rel. Sharp v. 0.62033 Acres of Land, 110 A.2d 1, 6 (Del. Super. Ct. 1954) (noting "the condemning authority may not exceed that which may in good faith be presumed to be necessary for future use within a reasonable time"); Reinecker v. Bd. of Trs., 426 P.2d 44, 47 (Kan. 1967) (noting "in determining what property is needed for public use, not only present demands, but those which may fairly be anticipated in the future, may be considered"); Pike County Board of Education v. Ford, 279 S.W.2d 245, 248 (Ky. 1955) (in determining whether a taking is necessary for public use, not only present demands but also those "fairly anticipated in the future" are proper inquiries); Exeter & Hampton Elec. Co. v. Harding, 199 A.2d 298, 299 (N.H. 1964) ("The law is clear that property may be taken not only for present demands but for uses which may be fairly anticipated in the future.").  But see United States v. Certain Parcels of Land, 215 F.2d 140, 147 (3d Cir. 1954) ("Once it is administratively determined that a property is to be taken for a public use, a United States court ordinarily will not review the reasonableness of the government's decision as to the time of taking"); United States v. 18.67 Acres of Land, 793 F. Supp. 582, 586 (M.D. Pa. 1992) (timing "is entirely in the hands of the [condemnor]").

26

182(b) grants the CRDA the authority to determine whether a project is "necessary," that authority is bound by evidence that a proposed redevelopment will occur in the foreseeable future. See Pike County, 279 S.W.2d at 248 (noting necessity determinations may be made in the context of not only present demands but also those "fairly anticipated in the future"). For example, there may exist: a detailed redevelopment plan showing a planned use for the condemned property; a developer, or group of developers, who have expressed interest in the redevelopment project; an RFP or other evidence of attempts to solicit developers' interest in the redevelopment project; or draft agreements with developers concerning the redevelopment. See Kelo, 545 U.S. at 473-74, 484 (describing an "integrated development plan" that was "comprehensive," and had been "finalized" and received "state-level approval"); see also Harrison, 398 N.J. Super. at 381-83 (noting Harrison's adoption of a "specific redevelopment plan," and revisions to the plan); Bryant, 309 N.J. Super. at 604-09, 620-23 (noting the existence of a redevelopment plan as well as the city's selection of the redeveloper and signed memorandum of understanding and redeveloper's agreement, with adequate assurances that public purposes would be fulfilled).

27

Judge Mendez was presented only with a "conceptual plan." The Project was described most specifically in 2012 as follows:

> The proposed project would be constructed in phases that complement the new Revel Casino and assist with the demands created by the resort. It is envisioned as a mixed use residential and retail development including restaurants, specialty stores, boutiques and residential housing for rent and purchase that tie into the open space greenway of the Absecon Lighthouse Park.

In 2014, two years after the CRDA approved the Project, and four months after it filed the condemnation complaint, the CRDA developed a "draft massing plan," which offered a visual depiction of the proposed Project. At the April 2016 hearing, however, CRDA had not formally approved the 2014 plan.

The Project was conceived as a complement to the Revel Casino, with revenue from the casino to be used to fund the Project. However, the Revel Casino declared bankruptcy and has not operated since September 2014. Thus, at the time of the judge's decision in 2016, the intended partner of the Project and its primary funding source had ceased to exist. In addition, in the interim between the CRDA's filing of the condemnation complaint and the judge's decision, statutory changes altered the financing of the CRDA, and reduced or eliminated key funding sources the CRDA relied on to "incentivize" private investors to commit to the redevelopment.

Under these highly unusual circumstances, it was reasonable for the judge to question whether the Project would proceed in the foreseeable future when determining whether the proposed condemnation constituted a manifest abuse of the CRDA's condemnation authority. The Project had stalled. Judge Mendez found that with the Revel Casino closed, Atlantic City experiencing an unprecedented financial downturn,[9] the Birnbaums' neighborhood being particularly hard hit, and the CRDA losing significant funding, the CRDA was attempting to "bank land in hopes that it will be used in a future undefined project." Approval of the condemnation could well leave the Birnbaum property vacant for an indefinite period of time, as the CRDA "wait[s] for the right project to present itself."

The evidentiary record supports Judge Mendez's factual findings, which are binding on this court. Rova Farms, 65 N.J. at 484. We affirm, because the CRDA could not provide evidence-based assurances that the Project would proceed in the reasonably foreseeable future.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] See, e.g., Review of City of Atlantic City's Recovery Plan Pursuant to the Municipal Stabilization and Recovery Act (Nov. 1, 2016), https://www.nj.gov/dca/news/pdf/atlantic_city_recovery_plan_2016.pdf (last visited Jan. 4, 2019).

A-0019-16T1