**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2559-21

NEW JERSEY TRANSIT
CORPORATION, an
instrumentality of the State of
New Jersey,

 Plaintiff-Respondent,

v.

TP ACCESS, LLC, a Delaware
limited liability company,

 Defendant-Appellant,

and

STATE OF NEW JERSEY,
DEPARTMENT OF THE
TREASURY, DIVISION OF
TAXATION, and VILLAGE OF
RIDGEFIELD PARK, in the
COUNTY OF BERGEN, a
municipal corporation of the
State of New Jersey,

 Defendants.

_____

Argued December 13, 2023 – Decided April 3, 2024

Before Judges Currier, Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8306-21.

Scott Andrew Heiart argued the cause for appellant (Carlin, Ward, Ash & Heiart, LLC, and McManimon, Scotland & Baumann, LLC, attorneys; Scott Andrew Heiart, Michael J. Ash, Kevin Patrick McManimon, and Joseph Paul Baumann, of counsel and on the briefs; Arthur Usvyat, on the briefs).

Dale L. Lessne argued the cause for respondent (Hill Wallack, LLP, and NJ Transit Corporation, attorneys; Dale L. Lessne, of counsel and on the brief).

PER CURIAM

In this condemnation matter, defendant TP Access, LLC (defendant) appeals from April 13, 2022 orders entering final judgment and appointing commissioners, and denying defendant's motion for a stay, discovery, and a plenary hearing. We affirm.

I.

Defendant owns two non-contiguous lots in the Village of Ridgefield Park. UBS owned larger adjacent parcels of land abutting defendant's

properties.[1]  In 1999, pursuant to the Local Redevelopment and Housing Law (LRHL), N.J.S.A. 40A:12A-1 to -89, Ridgefield Park designated certain parcels—including those eventually owned by UBS—in need of redevelopment. Years later, in 2012, Ridgefield Park adopted the "Skymark Redevelopment Plan."  In 2016, to further the Skymark Redevelopment Plan, Ridgefield Park expanded the designated redevelopment area to include the properties at issue, which were subsequently purchased by defendant.  Two developers were unsuccessful in their attempts to redevelop the area.

In 2019, NJ Transit began searching for properties to accommodate its need to construct a garage to house its growing fleet of large electric buses (the project).  In May 2019, NJ Transit sent a letter to defendant's principal, Gulshan Chhabra, informing him that NJ Transit "may require the acquisition of" defendant's properties.  The letter advised NJ Transit was "ready to initiate pre-acquisition activities," such as completing a property title report, survey, appraisal, and environmental investigation as part of the preliminary design of its project.

---

[1]  Plaintiff New Jersey Transit Corporation (NJ Transit or agency) acquired the UBS properties through "friendly" condemnation proceedings in November 2020.

A-2559-21

In July 2019, Patrick Ard, MAI, a licensed real estate appraiser, sent Chhabra a letter informing him that NJ Transit had retained his firm to inspect defendant's properties. Ard invited Chhabra to accompany him on the inspection and to provide any information he wanted Ard to consider in valuing the properties. In September, Chhabra sent an email confirming the inspection for the following day and including documents he wanted Ard to consider in his appraisal. One document was a valuation of the properties from a commercial real estate broker. The broker opined that if the properties were developed as a warehouse, they would be valued at approximately $30 million. The letter noted the properties were not zoned for warehouse development and the broker's opinion was not "an appraisal" in the legal sense, meaning it was not "a study and analysis by an appraiser authorized by law to perform appraisals."

After inspecting the properties, and considering the then-existing permitted uses, Ard concluded the highest and best permitted use was retail use, not industrial use, and appraised the value of the two properties at $9,600,000.

On May 6, 2020, NJ Transit informed Chhabra it had "determined that the acquisition of [defendant's] [p]roperties is required for [the project]." NJ Transit extended an offer of just compensation to Chhabra in the amount of $9,557,000.

A-2559-21

In response, defendant notified NJ Transit it wished to negotiate. On June 24, 2020, the parties conferred on a conference call. On July 6, defendant inquired about the scope of the project, how much acreage it required, and whether NJ Transit needed all of defendant's land. Defendant advised it wanted to "outline alternative scenarios that would permit [it] to redevelop at least a portion of [its p]roperty and/or some of the portion of the surrounding property, currently owned by UBS."

On August 11, 2020, NJ Transit informed defendant it needed all its property for the project. NJ Transit further informed defendant it would not entertain its $30 million counteroffer because it was "based on a highest and best use dependent on the rezoning of the properties." NJ Transit invited defendant to present another counteroffer based on then-current zoning or an appraisal prepared by a professional appraiser. NJ Transit informed defendant if there was no response by August 21, 2020, it would institute condemnation proceedings.

In continuing negotiations, defendant proposed a public-private partnership between itself and NJ Transit. On August 26, 2020, NJ Transit formally rejected the counteroffer and proposed partnership, stating it "would not be in furtherance of the agency's objectives to develop the proposed" project.

5

In September, NJ Transit sent defendant a copy of the conceptual plan for the garage and the minimum infrastructure requirements, which included an indoor parking facility for a minimum of 500 buses, comprised of both 45-foot and 60-foot articulated buses, maintenance bays to service both diesel and zero emission buses, washing facilities, parts storage facilities, staff offices, a welfare facility for bus operators and mechanics, electrical infrastructure to support an electric fleet, fuel storage, a backup generator for the entire facility, employee parking for a minimum of 600 vehicles, and fare collection lanes.

NJ Transit invited defendant to submit its plans and proposals for the redevelopment site, including site plans and applications, subdivision plans if applicable, granted approvals, redeveloper agreements, construction costs, financing term sheets, letters of intent for any proposed tenants, identification of any general contractor, construction contracts, traffic studies, geotechnical studies, environmental studies, wetlands delineation, and endangered species conservation plans if any. The agency explained, to the extent these documents existed, they would "suffice to provide NJ Transit a better understanding of [defendant's] proposed development for this site." NJ Transit requested defendant to review the conceptual plan for the garage project and provide a "comprehensive overview" and "revised site plan (in draft) to show how NJ

6

Transit's [project] can be developed (and provide for future expansion) in conjunction with [defendant's] proposed development of this property."

During this timeframe, Ridgefield Park expanded the redevelopment area to encompass both defendant's and UBS's properties. Defendant applied for and was designated as the "conditional redeveloper" of its properties. The Resolution adopting the designation noted defendant "has expressed a desire to redevelop the entire [r]edevelopment [a]rea" and that condemnation proceedings had commenced regarding defendant's and UBS's properties. The Resolution further stated defendant wanted to develop its properties either as "a mixed-use development consistent with the Redevelopment Plan but with an added warehouse component" if defendant could "secure control over [the] development rights for the entire [r]edevelopment [a]rea" or as "a warehouse of approximately 300,000+/square feet" if defendant could "retain control and development rights for its own propert[ies]."

On October 6, 2020, defendant suggested the parties, along with Ridgefield Park, enter into a memorandum of understanding to create a "framework for the construction and financing of a warehouse and [b]us [g]arage within the [r]edevelopment [a]rea together with the required off-site improvements." On January 26, 2021, NJ Transit notified defendant it was

7

proceeding with design work and "otherwise working diligently to advance this complex and important garage project." NJ Transit informed defendant it was close to completion of a schedule/timeline for the necessary steps in the process.

On March 26, 2021, NJ Transit advised defendant it intended to "fully explore the possible joint development of the properties through a competitive process and [was] in the process of defining the scope of that project and how to best procure a partner." NJ Transit offered to meet with defendant "to discuss the amount of the offer to purchase the propert[ies]" as stated in the May 6, 2020 letter "that was based on the appraised fair market value."

In a September 14, 2021 letter, NJ Transit referenced a recent meeting between the parties and confirmed its need to acquire all of defendant's property. The agency inquired whether defendant was willing to negotiate the purchase price and other relevant terms. NJ Transit also invited defendant to submit a counteroffer and the appraisal supporting the valuation of the counteroffer.

On October 8, 2021, defendant presented a counteroffer of $63,000,000. Defendant stated the highest and best use of the property was an industrial/warehouse use. It included three comparable sales for warehouses in the area. Defendant also advised it had two written offers to purchase the

property for $60,000,000, conditioned on zoning approval for industrial/warehouse use.

On October 21, NJ Transit formally rejected defendant's counteroffer for several reasons, but chiefly because it assumed an industrial/warehouse highest best use, which was "speculat[ive]" and ignored "the fact that the property currently is not zoned for such uses." The agency noted defendant's status as a conditional redeveloper could be revoked at any time, there was no redevelopment agreement between defendant and Ridgefield Park, and the process to amend Ridgefield Park's Redevelopment Plan to permit a warehouse use could be lengthy.

NJ Transit further noted that the offer letters defendant provided were prepared in 2020 and 2021, and there were no consummated purchase or sale agreements. In addition, the agency stated "offers are not considered when determining value via an appraisal. For these reasons," the offers were "speculative and not evidence of current value."

On November 12, 2021, NJ Transit reminded defendant that the agency had continuously engaged in negotiations in the eighteen months since it sent its initial offer and appraisal in May 2020. NJ Transit reiterated that defendant's counteroffer's valuation was speculative as the property was not zoned for

industrial/warehouse. The agency expressed interest in a resolution based on "current, non-speculative circumstances." However, it also advised that if the matter could not be resolved amicably, it would have no choice other than to institute condemnation proceedings.

## II.

On December 20, 2021, by way of verified complaint and order to show cause as a summary proceeding, NJ Transit filed a condemnation action pursuant to the Eminent Domain Act of 1971 (the Act), N.J.S.A. 20:3-1 to -50. In support of its complaint and order to show cause application, NJ Transit provided the metes and bounds description of the property, parcel maps, Ard's appraisal, and site remediation reports.

Defendant filed an answer and cross-moved to dismiss the verified complaint, including a certification from the Ridgefield Park mayor stating that "[t]he development of a portion of the [p]roperties with a warehouse use would significantly help [Ridgefield Park] to offset the loss of more than 40 acres of taxable real property as a result of the planned bus garage." Defendant also provided a 2020 amended Redevelopment Plan, which it had submitted to Ridgefield Park, and a proposed amended master plan. In addition, defendant submitted the correspondence exchanged between the parties, the unsigned

10

letters of intent to purchase the property for $60 million, and the draft bus garage design brief.

In reply, and in opposition to the dismissal motion, NJ Transit presented certifications from its Director of Property Valuation & Financial Analysis for Real Estate, Economic & Transit Oriented Development and Michael Kilcoyne, Senior Vice President and General Manager of bus operations. Kilcoyne certified the agency's board of directors adopted a March 2020 resolution authorizing the project with the knowledge that its North Jersey bus garages were already operating at 28% over their design capacity. He further certified the March 2020 resolution anticipated a 2028 construction completion date, and cost overruns from delays in constructing the project would cost the agency an additional $17 million per year of delay.

NJ Transit also submitted certifications from its Chief Capital Project Manager and Chief Planner. Both attested to the physical shortcomings of the agency's current facilities and the specific need for the project to be located at Ridgefield Park's redevelopment sites.

On April 13, 2022, the trial court heard oral argument on the order to show cause and cross-motion to dismiss and issued orders entering final judgment for NJ Transit and appointing commissioners and denying defendant's cross-motion

A-2559-21

and request for discovery. In an accompanying written statement of reasons, the trial court found it was undisputed the Act authorized NJ Transit to acquire or condemn public or private property.

The trial court relied on the detailed certifications from NJ Transit's planner, engineer, director of finances, and bus operation executive. The court noted the agency was required under a statewide mandate to transition to a 100% zero emission fleet by 2040. The court further noted the garage would provide the critical infrastructure support to enable NJ Transit to meet this goal by both easing capacity at existing facilities, and allowing retrofitting, while also supporting the current fleet during planned upgrades to sixteen existing bus garages.

In citing to the certification of the Chief Planner, the court noted NJ Transit had reviewed and analyzed forty potential sites for the project before concluding defendant's and UBS's sites met all its criteria. The court further noted the agency considered proximity to existing operations' needs, access to major roads and highways, environmental issues, separation from residential areas, ability to accommodate ancillary uses, and zoning, among other factors. The court also considered the certified testimony that a new bus garage was necessary to house up to 500 new 45-foot buses in its Northern division to

alleviate overcrowding in existing garages, allow for future growth, accommodate the modernization of the new fleet, and permit the phasing out of an older garage.

The court concluded the acquisition of defendant's property was reasonably necessary, and NJ Transit was acting within the scope of its authority. The court further found NJ Transit had complied with the Act's pre-litigation requirements under N.J.S.A. 20:3-6. The court found no evidence of bad faith, fraud, or "circumstances revealing an arbitrary or capricious action." The court stated the "disagreement of [defendant] with the amount of compensation found by the appraisal and the quality of that appraisal is just that, mere disagreement[,] not proof bona fide negotiations did not take place."

In addition, contrary to defendant's contention that NJ Transit failed to bargain in good faith, the court found it "uncontroverted" that the third-party letters of intent to purchase defendant's properties for $60 million in November 2020 and October 2021 were "conditioned upon the properties being developed with a warehouse which is not currently a permitted use." The court denied a stay of its decision.

On appeal, defendant contends the court erred in entering final judgment because NJ Transit did not demonstrate the required necessity to acquire the properties and it did not engage in bona fide negotiations. Defendant further asserts the court erred in not granting it discovery and a plenary hearing.

"'Eminent domain is the power of the State to take private property for public use . . . .'" Casino Reinvestment Dev. Auth. v. Birnbaum, 458 N.J. Super. 173, 187 (App. Div. 2019) (quoting Twp. of W. Orange v. 769 Assocs., L.L.C., 172 N.J. 564, 571 (2002)). Our courts typically "grant[] wide latitude to condemning authorities." 769 Assocs., L.L.C., 172 N.J. at 572. When an agency has statutory authority to condemn under conditions it deems necessary, its determinations about necessity and actions are not unfettered but "are subject to a review on the basis of manifest abuse of power." See Birnbaum, 458 N.J. Super. at 190-93 (holding a redevelopment agency's mere "stockpiling of land" was not reasonably necessary where the Board had not approved the conceptual plan).

"A reviewing judge will not overturn an exercise of eminent domain without affirmative proof of 'fraud, bad faith, or a manifest abuse' of authority." Id. at 187 (quoting City of Trenton v. Lenzner, 16 N.J. 465, 473

(1954)). The trial judge's factual findings "are considered binding on appeal when supported by adequate, substantial[,] and credible evidence," Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974), while the judge's legal findings are reviewed de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

N.J.S.A. 27:25-13(b) authorizes NJ Transit:

> to acquire by purchase, [or] condemnation . . . on the terms and conditions and in the manner it deems proper, any land or property real or personal, tangible or intangible which it may determine is reasonably necessary for [its] purposes . . . under the provisions of this act.

"[W]hen acquiring property pursuant to subsection[] . . . [(b)] . . . [NJ Transit] shall exercise its power of eminent domain in accordance with the provisions of the [Act]." N.J.S.A. 27:25-13(c)(1).

Under the statute, NJ Transit may condemn property only if the land "is reasonably necessary for [its] purposes." N.J.S.A. 27:25-13(b). Reasonable necessity has not been construed to "mean '"absolutely necessary" or "indispensable" but [] it is sufficient if the right proposed to be acquired is reasonably necessary to secure the end in view.'" Borough of Glassboro v. Grossman, 457 N.J. Super. 416, 432 (App. Div. 2019) (alteration in original) (quoting Vineland Constr. Co. v. Twp. of Pennsauken, 395 N.J. Super. 230, 261

15

(App. Div. 2007) (Holston, J., dissenting), <u>appeal dismissed as moot</u>, 195 N.J. 513 (2008)). In <u>Grossman</u>, we stated:

> a condemning authority must do more than recite that a parcel it seeks to condemn has some unexplained necessity to the overall redevelopment area or the redevelopment plan. Instead, there must be a particular redevelopment project identified and tied to the proposed acquisition. To be sure, that project can be massive in scope, such as the building of retail stores and other commercial establishments within a whole downtown district—or more modest, such as the demolition of a particular street corner for a parking garage or new municipal building. Our point is that there must be an explained linkage between the property to be acquired and the identified project.
>
> . . . The claim of necessity, if challenged, must be justified by a reasonable presentation of supporting proof. It will not suffice for the condemning authority to just "say so."
>
> [<u>Id.</u> at 435.]

Moreover, "no supporting evidence has to be presented unless and until the necessity of the taking is challenged by an adversary." <u>Id.</u> at 436.

NJ Transit presented substantial evidence demonstrating the necessity of the acquisition of defendant's properties for its project. That evidence included certifications from NJ Transit's management; a director and a senior executive outlined the agency's need for a new Northern hub located near major highways to accomplish the dual missions of alleviating overcrowding at current facilities

16

and creating infrastructure for expansion for a new fleet of electric vehicles pursuant to a state mandate. After considering forty sites in North Jersey, only four were identified as potential locations. Ultimately, NJ Transit concluded the combined area of defendant's and UBS's properties best met its criteria. The agency's determination that defendant's properties were reasonably necessary to complete its project was not a manifest abuse of its authority.

Defendant's reliance on Birnbaum to support its position is misplaced. There, the agency's Board adopted an initial "conceptual plan" but had not presented any subsequent critical plans to carry out implementation of its proposal before seeking condemnation of the plaintiffs' land two years later. 458 N.J. Super. at 191-93. In contrast, NJ Transit presented detailed documents regarding its intended development of defendant's properties. Unlike in Birnbaum, NJ Transit was not acquiring defendant's properties to stockpile potential locations for its project.

As the trial court found, the comprehensive certifications submitted by NJ Transit provided substantial evidence to demonstrate the acquisition of defendant's property was reasonably necessary to complete its project. We see no reason to disturb that finding.

17

We turn to defendant's assertion that NJ Transit failed to comply with pre-litigation eminent domain requirements, specifically that the agency did not engage in bona fide negotiations. We are unpersuaded.

The Act imposes an obligation on government entities to engage in "bona fide negotiations" with property owners in condemnation proceedings. N.J.S.A. 20:3-6. Such negotiations require:

> an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules. Prior to such offer the taking agency shall appraise said property and the owner shall be given an opportunity to accompany the appraiser during inspection of the property. Such offer shall be served by certified mail. In no event shall such offer be less than the taking agency's approved appraisal of the fair market value of such property. A rejection of said offer or failure to accept the same within the period fixed in written offer, which shall in no case be less than 14 days from the mailing of the offer, shall be conclusive proof of the inability of the condemnor to acquire the property or possession thereof through negotiations.
>
> [Ibid.]

Bona fide negotiations began here in May 2020 when NJ Transit informed defendant of the need to acquire its property and offered just compensation of

18

$9,557,000 per its appraisal. NJ Transit continued to engage in negotiations with defendant for the next eighteen months—until December 2021 when it concluded the parties were unable to achieve a resolution. During that lengthy period of time, defendant repeatedly only extended a counteroffer of $60 million, based on a highest and best use of the property for which it was not zoned. The counteroffer was not supported by an appraisal from a licensed real estate appraiser. Rather, it was based on two unsigned and unconsummated offers to purchase the property conditioned on a zoning amendment to permit industrial/warehouse use. There is ample evidence that NJ Transit engaged in lengthy negotiations with defendant and was unable "to acquire the property . . . through negotiations." Ibid.

We are satisfied the trial court amply supported its decision to enter final judgment for NJ Transit and to deny discovery and a plenary hearing. Any arguments regarding the valuation of the property and fair compensation will be determined by the commissioners. Hous. Auth. of New Brunswick v. Suydam Invs., L.L.C., 177 N.J. 2, 16-17 (2003) (explaining that "the three commissioners, or at least a majority of them, must fix and determine the compensation to be paid by the condemnor to the condemnee" (citing N.J.S.A.

20:3-12(g))).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2559-21